## A08A2169. AGRICOMMODITIES, INC. v. J. D. HEISKELL & COMPANY, INC.
### (676 SE2d 847)

MIKELL, Judge.
AgriCommodities, Inc. ("AgriCommodities") sued J. D. Heiskell & Company, Inc. ("Heiskell"), for breach of contract, promissory estoppel, and attorney fees arising out of the necessity to cover an alleged commodities contract for the purchase of cottonseed.[1] The trial court denied AgriCommodities' motion for summary judgment, but granted Heiskell's, finding that the evidence did not support a cause of action for breach of contract or promissory estoppel.

---

[1] AgriCommodities withdrew its punitive damages claim.

AgriCommodities appeals from this order. For the following reasons, we affirm.

Our review of the grant of summary judgment is de novo.[2]

> To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. Where the movant is the plaintiff, she has the burden of presenting evidence to support her claim and the burden of piercing the defendant's affirmative defenses.[3]

So viewed, the record reflects that AgriCommodities and Heiskell are engaged in the business of cottonseed commodity trading. On June 6, 2003, David Murphree of Mid American Commodities ("Mid American") brokered a trade between an AgriCommodities trader, Joe Rambo, and a Heiskell trader, Todd Parker, for the purchase of sixteen truckloads of cottonseed at $130 per ton to be delivered at the rate of two truckloads per month from January 2004 through August 2004. On that same date, Mid American faxed a confirmation sheet to both parties setting out the terms of the sale, and noting "Subject to Credit Approval." The confirmation was made pursuant to National Cottonseed Producers Association Rules ("NCPA"). Agri-Commodities' President, Paul Rosensweig, deposed that he received a credit application from Heiskell several days later, completed the form, and faxed it back to Heiskell on June 30, 2003; however, he stated that he could not find a copy of the document nor did he ever receive written or oral notification from Heiskell approving or disapproving the credit application. Rosensweig deposed that after he purchased the cottonseed from Heiskell, he turned around and sold it to another party sometime in August or September 2003. Rosensweig explained that he subsequently sent to Heiskell at least eight "Purchase Contract Confirmations" to be signed by Heiskell, confirming the trade. The confirmations, which were not dated, were signed by Rosensweig and included the following language: "If this confirmation is not in agreement with your understanding of the contract, please notify us immediately. Failure to notify buyer within 24 hours denotes . . . acceptance of this contract as stated. Please sign and return one copy." Heiskell did not sign or return any of the confirmations. Rosensweig further averred that AgriCommodities maintains impeccable credit and has never been turned down on a credit application.

---

[2] *Smith v. Gordon*, 266 Ga. App. 814 (1) (598 SE2d 92) (2004).

[3] (Footnotes omitted.) Id.

Parker averred that on June 6, 2003, he received a call from a Mid American Commodities broker who had a buyer interested in purchasing cottonseed; that Parker quoted the broker his price for the day; and that he informed the broker that any trade would be "subject to J. D. Heiskell approving the credit worthiness of the buyer." Parker stated that he never received oral or written confirmation from Mid American that a contract had been arranged. He further asserted that he never faxed a credit application to AgriCommodities nor received a completed application from them. Parker's manager, John Kauffmann, similarly averred that he could find no record of a trade with AgriCommodities, or any evidence that AgriCommodities had been approved for credit.

Chad Pinter, Heiskell's corporate controller, averred that Heiskell does not extend credit to potential new customers without investigating the customer's credit history. Pinter explained that a potential new customer will not be recognized as a customer until his office approves that customer's credit. According to Pinter, Heiskell never received a credit application from AgriCommodities and was never entered into Heiskell's computer system as a customer.

Timothy Regan, Heiskell's chief financial officer, averred that although NCPA rules provide that unless otherwise specified in a contract, all trades are for cash, cash on delivery ("COD") accounts are somewhat rare. According to Regan, Heiskell does not take new customers on a COD basis because "it is simply not worth the company's time and effort to take on new COD customers who are not able to qualify under J. D. Heiskell's normal credit terms."

Murphree, the Mid American broker, averred that on June 6, 2003, he brokered a trade between AgriCommodities and Heiskell and that he verbally confirmed the sale terms to their respective traders, Rambo and Parker. The next day, Murphree called Rambo and Parker to ask if the appropriate credit forms had been sent and was told that it would be handled by others in the company.[4] As is his normal practice, Murphree confirmed the trade by faxing to both parties a copy of a confirmation titled, "Contract Number 17451." Murphree explained that under NCPA rules, the faxed confirmation "bound each party to the agreement. Because of the rapid pace of the commodities futures, the parties are not in a position to each sign the same physical document. Therefore, the common practice is for the broker to send a copy of the agreement to both parties which was done in this case."[5] Murphree further averred that in the commodi-

---

[4] Parker disputes this allegation in a supplemental affidavit, explaining that the following day was a Saturday and that he did not make or confirm sales on Saturdays.

[5] Rule 60 of the NCPA provides that

[w]hen a broker member of the Association arranges a trade for a member or

ties industry, the term "subject to credit approval" defines the terms of payment, meaning whether the buyer will be required to pay cash or be allowed to be billed for the product.

In November 2003, the price for cottonseed began to rise. Several weeks later, when Rosensweig realized that the cottonseed would not be delivered by Heiskell, he purchased 16 truckloads of cottonseed from another seller and then filed this action against Heiskell for the difference between that purchase price and the alleged contract price, approximately $8,000.

1. At the outset we note that AgriCommodities has failed to abide by Court of Appeals Rule 28 (a) (3) by requesting oral argument in its brief rather than in a separate document certifying, among other things, that opposing counsel has been notified of the request. AgriCommodities' request for oral argument is denied.

Additionally, neither AgriCommodities nor Heiskell has properly cited the record in its brief. Court of Appeals Rule 25 (c) (2) (iii) provides that "[r]eference to the record should be indicated by specific volume or part of the record and by (R-Page Number of the Record)." Citing to the index page number and then the page number of the particular document or transcript as filed in the lower court — and not the *record page number* — is confusing and has hampered our review of this case. We remind counsel that our rules on the form of appellate briefs

> were created not to provide an obstacle, but to aid parties in presenting their arguments in a manner most likely to be fully and efficiently comprehended by this Court. Furthermore, it is not the function of this Court to cull the record on behalf of a party; the burden is upon the party asserting error to show it affirmatively in the record.[6]

Accordingly, if we have omitted any facts or failed to locate some

---

members of the Association, it shall be the duty of such broker to immediately confirm by telephone to each principal or interested party the terms of such trade. It will be the duty of the broker to either mail contracts or transmit a facsimile of the contract on the day of the transaction to all interested parties. When such contract or facsimile is received by the principals and found not to be in accord with the offer or acceptance, they, or either of them shall no later than the next business day notify the broker by telephone or facsimile of any error or discrepancy and the broker shall issue a corrected contract or facsimile to each party.

Rule 61 provides that "[a] broker's contract or facsimile shall be binding on both buyer and seller, as though signed by both parties. Such contracts shall be issued in triplicate, one copy or facsimile being sent to the buyer and one copy or facsimile being sent to the seller, with one copy being retained by the broker."

[6] (Punctuation and footnotes omitted.) *Walter v. Mitchell*, 294 Ga. App. 689, 690 (1) (669 SE2d 706) (2008).

214

evidence in the record, the responsibility rests with counsel.

2. AgriCommodities contends that the trial court erred in granting summary judgment to Heiskell because there was no evidence that the trade confirmation was not sent. AgriCommodities also contends that summary judgment in Heiskell's favor was improper because Heiskell did not conduct a credit inquiry on AgriCommodities. We do not agree.

Since this case involves the sale of goods and not services, it is controlled by Georgia's Uniform Commercial Code (UCC), OCGA § 11-1-101 et seq. With regard to formation of a contract in general under the UCC, OCGA § 11-2-204 provides as follows:

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined. (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Although the UCC makes contracts easier to form, the general rules governing contract formation still apply.[7] In particular, Georgia law has long required that in order to form a valid contract, there must be a meeting of the minds or mutuality.[8] In this case, there was no mutuality.

It is clear from the confirmation sheet that any trade between AgriCommodities and Heiskell was contingent upon AgriCommodities receiving credit approval from Heiskell. Although Rosensweig maintains that he received a credit application from Heiskell and that his wife completed the application, Rosensweig was unable to produce a copy of the application and Heiskell had no record of ever receiving the application or approving AgriCommodities as a customer. While AgriCommodities and Heiskell had reached an agreement on the amount and price of cottonseed, there is no evidence that AgriCommodities ever received credit approval from Heiskell. Accordingly, there was no valid agreement between the parties. As Heiskell points out in its brief, since it undertakes considerable

---

[7] See *D. N. Garner Co. v. Ga. Palm Beach Aluminum Window Corp.*, 233 Ga. App. 252, 256 (2) (504 SE2d 70) (1998); *Drug Line v. Sero-Immuno Diagnostics*, 217 Ga. App. 530, 531 (458 SE2d 170) (1995).

[8] *Drug Line*, supra. See also *Moore v. Buiso*, 235 Ga. 730, 731 (1) (221 SE2d 414) (1975) (when contingency in contract has not been met, contract lacks mutuality and is unenforceable).

market risks with each trade, it could not stay in business if it did not undertake a thorough review of a customer's credit before buying and selling commodities for that customer. If AgriCommodities had not been creditworthy under Heiskell's standards, Heiskell would have had no interest in consummating the trade with AgriCommodities. AgriCommodities itself acknowledged the importance of credit approval when Denise Rosensweig, AgriCommodities's CFO and Paul Rosensweig's wife, deposed that if a customer had poor credit, AgriCommodities would not sell to them for fear of not getting paid and that it would be very difficult for anybody buying or selling cottonseed to operate without good credit. Since there is no evidence that AgriCommodities ever received credit approval, the June 6, 2003, order confirmation was not an enforceable contract.

AgriCommodities contends that under NCPA rules, the contract is complete upon the broker confirming the transaction, not the receipt of the transaction confirmation, and according to Murphree, he confirmed the transaction with Rosensweig and Parker. Even though the UCC makes contracts easier to form by providing that they may be formed "through conduct rather than merely through the exchange of communications constituting 'offer and acceptance,'" there still must be some evidence of a valid and enforceable agreement between the parties.[9] As discussed above, however, the alleged contract here was not enforceable, and Murphree's confirmation does not render an unenforceable contract enforceable.

We also agree with the trial court that AgriCommodities cannot succeed on its promissory estoppel claim. Under the doctrine of promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."[10] In order to succeed on its promissory estoppel claim, AgriCommodities must demonstrate that (1) Heiskell made certain promises, (2) Heiskell should have expected that AgriCommodities would rely on such promises, and (3) AgriCommodities did in fact rely on such promises to its detriment.[11] "[P]romissory estoppel cannot be applied unless the promisee reasonably relied on the promise."[12] The trial court ruled that AgriCommodities' reliance on the order of June 6, 2003, to create a binding

---

[9] (Citation omitted.) *D. N. Garner*, supra; *Drug Line*, supra.

[10] OCGA § 13-3-44 (a).

[11] *Lake Tightsqueeze, Inc. v. Chrysler First Financial Svcs. Corp.*, 210 Ga. App. 178, 180 (2) (435 SE2d 486) (1993).

[12] (Citation and footnote omitted.) *Pabian Outdoor-Aiken, Inc. v. Dockery*, 253 Ga. App. 729, 731 (560 SE2d 280) (2002).

promise under OCGA § 13-3-44 was unreasonable as a matter of law because AgriCommodities never received credit approval, an essential element of the cottonseed business.

AgriCommodities knew the importance of good credit and acknowledged that it would be difficult for anybody buying or selling cottonseed to operate without good credit. The trade confirmation faxed by Murphree to Rosensweig specifically provided that it was "Subject to Credit Approval" and Rosensweig acknowledged this condition by completing a credit application form and faxing it to Heiskell. Under these circumstances, it was not reasonable for AgriCommodities to rely on the confirmation sheet as a binding promise by Heiskell to sell 16 truckloads of cottonseed to AgriCommodities without approving its credit. Similarly, nothing that Heiskell said or did reasonably could have induced AgriCommodities to rely on any alleged promise to its detriment. On the contrary, the record reflects that Rosensweig never attempted to follow up on the status of the credit application; that Rosensweig sold the cottonseed to another party before confirming that the credit application had been approved; and that Rosensweig never spoke to anyone at Heiskell or received any sort of response to the eight letters he sent, seeking to confirm the existence of a contract. When Heiskell told Murphree that it would sell cottonseed to AgriCommodities, it did so subject to AgriCommodities' credit approval, a provision clearly stated on the confirmation sheet. We conclude that, as a matter of law, Heiskell could not have reasonably expected that AgriCommodities would rely on the confirmation sheet as a binding, enforceable promise. Thus, there is no basis for a legally cognizable promissory estoppel claim.[13]

Because the evidence does not support AgriCommodities' claims for breach of contract and promissory estoppel, AgriCommodities is not entitled to attorney fees. The trial court correctly granted summary judgment to Heiskell on AgriCommodities' claims for breach of contract, promissory estoppel, and attorney fees.

3. In light of our holding in Division 2, AgriCommodities' contention that the trial court erred in denying its motion for summary judgment is rendered moot.

*Judgment affirmed. Smith, P. J., concurs. Adams, J., concurs in judgment only.*

DECIDED FEBRUARY 13, 2009 —
RECONSIDERATION DENIED MARCH 31, 2009.

---

[13] See id.

*John T. Garcia*, for appellant.

*Wilkinson & Magruder, Andrew M. Magruder*, for appellee.