## S12G1842. CITY OF BALDWIN v. WOODARD & CURRAN, INC.
### (743 SE2d 381)

NAHMIAS, Justice.

Woodard & Curran, Inc. ("W&C"), an environmental engineering company, sued the City of Baldwin, Georgia, seeking damages on claims of breach of contract and quantum meruit. After a trial, a jury awarded W&C $203,000 in a general verdict that did not specify the basis for the damages. The Court of Appeals affirmed. See *City of Baldwin v. Woodard & Curran, Inc.*, 316 Ga. App. 768 (730 SE2d 486) (2012). We granted certiorari to consider two issues: (1) whether the Court of Appeals erred in holding that quantum meruit is an available remedy against a municipality when the claim is based on a municipal contract that is ultra vires; and (2) whether the Court of Appeals erred in determining that the jury was properly allowed to consider the breach of contract claim based on an agreement the parties entered in May 2009. We conclude that the Court of Appeals erred in both respects, and we therefore reverse its judgment.

1. (a) In the spring of 2009, the City of Baldwin was planning to apply for federal government stimulus funds to improve the headworks and other components of its wastewater treatment plant. W&C, which was operating the plant for the City, wanted to assist the City in applying for the funds and hoped to design the plant improvements and provide services during their construction. To obtain the stimulus funds, the project had to be "shovel-ready" no later than November 1, 2009.

In May 2009, W&C presented the City's Mayor, Michael Kelley, with a document (the "May Agreement") that said on its first page:

> We will provide the supporting engineering documents for [the City's] funding application in order to convert this project from "fundable" to "funded" for a Lump Sum fee of $5000. . . . Under separate covers, we will be preparing a scope, budget, and schedule for the actual design work for the Headwords [sic] and associated improvements (including the Design Development Report for the overall plant) and also will submit a grant application to Rural Development to fund the development of a capital master plan for the water and wastewater systems.
>
> Additional engineering fees will only be contracted once funding has been committed.

Section 6-9 of the City's Charter, which was enacted by the Georgia General Assembly in 1986, see Ga. L. 1986, p. 5578, says:

> No contract with the city shall be binding on the city unless the contract is in writing, is signed after review by the city attorney, and is approved by the city council subsequent to its signature by the city attorney, with such council approval entered on the council journal.

The City Council consists of five members and the Mayor, Charter § 2-1, and acts like approving contracts require the vote of at least three of the council members, Charter § 2-8, with the Mayor having the right to vote only "in the case of a tie vote among the council members voting," Charter § 2-13.

On May 26, 2009, the May Agreement was approved by the City Council as required by the Charter. In accordance with the agreement, W&C prepared the City's funding application, including supporting engineering documents. Shortly before June 15, 2009, the funding agency informed W&C that the application for project funding was complete and approved. On June 23, W&C sent the City an invoice for its work on the "Headworks Design Funding Application," which referenced a specific project number for those services. The City then paid W&C the $5,000 lump sum fee set forth in the May Agreement.

On June 15, based on the approval of the project funding application, W&C sent Mayor Kelley a second document labeled "Proposal for Professional Engineering Design Services" (the "June Proposal"). The June Proposal stated that W&C appreciated the City's asking W&C to "prepare a proposal for the design" of the wastewater plant improvements. The proposal then detailed the plant's deficiencies and W&C's plans for correcting them, estimating the total cost of the project to be $1,995,000. The proposal listed the services that W&C would provide, including conducting project meetings with the City and government agencies; ensuring that on-site measurements, surveys, and geo-technical core drilling necessary to complete the plant's new design would be conducted; completing the necessary environmental permitting applications; designing the project specifications; and overseeing the bidding phase of the project to ensure its appropriate completion. The proposal concluded by saying that W&C could complete the design work "within 8 to 12 weeks after receiving authorization to proceed"; that its services under the proposal would cost no more than $210,000; that the Mayor should "review this proposal" and "call [W&C] to discuss any questions or comments";

and that "[i]f everything is in order," the Mayor should sign the proposal and return it to W&C to authorize it to proceed with the work.

After submitting the June Proposal, W&C stopped working on the project while waiting for authorization from the City to proceed. On August 19, W&C sent the Mayor an e-mail with an attached document that listed the requirements that still needed to be met for W&C's work on the project to proceed, including "approval by the City Council" of the June Proposal. On August 20, at a meeting attended by the Mayor, two of the five City Council members, and W&C Project Manager Bill King, Mayor Kelley signed the June Proposal under "Authorization to Proceed," but he did not date the document. Instead, the date was later written in by a co-worker of Bill King at W&C.

The Mayor testified at trial, without dispute, that he did not date the document because he did not have authority to obligate the City by himself and that he explained to King and the others present that the June Proposal would not go into effect until it had been reviewed by the city attorney and voted on by the City Council. That same day, the Mayor signed and dated a certificate of readiness that was required by the funding agency, which King testified was essentially a promise to the agency that W&C and the City would "get this job done." However, the June Proposal was never "signed after review by the city attorney, and . . . approved by the city council subsequent to its signature by the city attorney, with such council approval entered on the council journal." Charter § 6-9.

Nevertheless, after the Mayor signed the June Proposal, W&C began to work intensely on the tasks described in the proposal, hiring a surveyor, completing its design of the plant improvements, advertising the project for bids, and meeting with the bidders. Preliminary and final approvals for the project from the funding agency and other necessary agencies were obtained during the last two weeks of September. On September 28, King met with the Mayor and City Council, at the Mayor's request, to update them on the progress of the project. However, on October 21, 2009, the day before the project bids were to be opened, the City learned that the stimulus funds for which the City had been approved had been exhausted on other projects. The City never received any funding, and the wastewater plant improvements were never done.

In a letter sent to the City on November 17, 2009, W&C said that it had completed its work for the "Headworks Design" "in accordance with our contract dated June 15, 2009 and authorized by you on August 20, 2009." The letter attached an invoice for $203,870.44; it specified a different project number than the invoice submitted for

the May Agreement, and almost all the listed services were done between August 20 and October 23. The City denied payment, and this litigation ensued.

(b) In its complaint against the City, W&C alleged that the parties had entered two contracts. "On May 15, 2009, [the parties] entered into a written contract whereby . . . [the City] was to pay [W&C] the sum of $5,000.00," and "[o]n August 20, 2009, [the parties] entered a written contract whereby . . . [the City] was to pay [W&C] a sum not to exceed $210,000.00." W&C asserted that the City had failed to pay "under said contracts" and sought damages of $203,870.44 for breach of contract. W&C alternatively sought the same amount of damages pursuant to a claim for quantum meruit.

The City moved for summary judgment, contending that it had paid W&C the $5,000 due under the May Agreement and that, because the June Proposal had not been adopted in compliance with the City Charter's requirements, it was ultra vires under *H.G. Brown Family L.P. v. City of Villa Rica*, 278 Ga. 819 (607 SE2d 883) (2005), and could not support W&C's breach of contract or quantum meruit claims. After W&C admitted that it had been paid $5,000 under the May Agreement, the trial court granted summary judgment to the City on that breach of contract claim. The court also granted summary judgment to the City on W&C's breach of contract claim based on the June Proposal, ruling that the contract was ultra vires under *H.G. Brown*. However, the trial court denied the City's motion for summary judgment on W&C's quantum meruit claim, ruling that the claim could be based on work W&C did in reliance on the June Proposal.

In a subsequent pretrial order, W&C asserted two new theories of recovery based on the May Agreement. W&C now claimed that the "[u]nder separate covers" sentence of the May Agreement authorized W&C to perform the actual design work and oversee the bidding and construction of the plant improvements; W&C accordingly sought $203,870.44 in damages for breach of that part of the May Agreement and the same amount of damages under a quantum meruit theory based on the May Agreement. At trial, the court allowed the jury to consider these theories of recovery along with the quantum meruit claim based on the June Proposal. The jury returned a general verdict for W&C in the amount of $203,000, without specifying which claim provided the basis for the damages award.

After the trial court entered judgment on the verdict, the City appealed, and the Court of Appeals affirmed. It rejected the City's argument that *H.G. Brown*, read together with *PMS Construction Co. v. DeKalb County*, 243 Ga. 870 (257 SE2d 285) (1979), precluded W&C from recovering on its quantum meruit claim against a municipality

based on an ultra vires contract. See *City of Baldwin*, 316 Ga. App. at 770-772. The Court of Appeals also held that the jury was entitled to consider W&C's breach of contract claim based on the May Agreement, concluding that the "[u]nder separate covers" portion of that document constituted a valid contract for the $203,000 worth of work that W&C performed. See id. at 774-775. We granted the City's petition for certiorari to review both of those rulings.

2. (a) "The theory of quantum meruit is . . . an equitable principle . . . based upon the premise that, 'when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof.'" *Georgia Dept. of Community Health v. Data Inquiry, LLC*, 313 Ga. App. 683, 687 (722 SE2d 403) (2012) (quoting OCGA § 9-2-7).[1] OCGA § 36-10-1, however, provides that "[a]ll contracts entered into by the county governing authority with other persons in behalf of the county shall be in writing and entered on its minutes." In 1979, this Court held in *PMS Construction Co.*, 243 Ga. at 872, that

> a plaintiff must prove an express contract with the county in order to recover for breach of contract and . . . no recovery may be had for an implied contract, called "quantum meruit" . . . . When one party furnishes and another accepts valuable services, the law generally imposes a duty to pay, regardless of the intention of the parties. This theory of recovery is not available when a county is the defendant. This result is dictated by the statutory requirements for establishing a contract with a county.

*PMS Construction* did not discuss whether the failure of a government to comply with statutory requirements for entering a contract would render the contract "ultra vires," but in 2005 we addressed that issue in the context of a municipal contract. In *H.G.*

---

[1] Because quantum meruit is an equitable claim, as opposed to an action "ex contractu for the breach of [a] written contract," it is well-established that such a claim against the State or its departments and agencies is barred by sovereign immunity. See Ga. Const. of 1983, Art. I, Sec. II, Par. IX; *Ga. Dept. of Community Health*, 313 Ga. App. at 687-688. Whether a quantum meruit claim against a *municipality* is similarly barred by the distinct constitutional provision affording immunity to municipalities, see Art. IX, Sec. II, Par. IX; *City of Thomaston v. Bridges*, 264 Ga. 4, 7 (439 SE2d 906) (1994) (holding that municipalities are not state "departments and agencies" under Art. I, Sec. II, Par. IX), appears less clear. In *Watts v. City of Dillard*, 294 Ga. App. 861 (670 SE2d 442) (2008), the Court of Appeals held that "sovereign immunity" barred claims against a city for an implied contract and under the equitable theory of money had and received, but the court relied on precedents involving state agencies immunized under Art. I, Sec. II, Par. IX. See *Watts*, 294 Ga. App. at 863-864. Because the City never raised municipal immunity as a defense in this case, and because that issue has not been briefed or addressed by the courts below, we leave its resolution for another day.

*Brown Family L.P.*, 278 Ga. 819, the Mayor of Villa Rica, along with two city council members, executed a contract to purchase a right-of-way from H.G. Brown. See id. at 819. The city's charter, however, required contracts to be approved by the city council, and the three officers in question did not constitute a quorum under the charter. We also noted that the contract had not been presented to the city attorney, another charter requirement. See id.

H.G. Brown later sued the city, seeking mandamus relief to compel the city to validate the contract. The city defended on the ground that the contract was ultra vires and void. We explained that a contract is ultra vires and an "absolute nullity" if a local government enters it "in abrogation of its delegated power or in excess of its authority to enter contracts," but that a contract may not be completely ineffective if it had merely been "imperfectly or irregularly executed." *H.G. Brown*, 278 Ga. at 820. We explained further that "the City's charter, enacted by the General Assembly, sets forth the parameters of the City's authority to take official action, including its ability to enter into contracts." Id. We then held that H.G. Brown's contract was ultra vires, attaching controlling significance to the fact that the city council had not approved the contract:

> The officer, body, or board duly authorized must act on behalf of the municipality, otherwise a valid contract cannot be created. . . . [T]he governing body . . . must act at a legal meeting and as a board, since the individual members acting singly have no authority to bind the municipality.

Id. at 821 (quoting 10 McQuillin, Municipal Corporations § 29.15 (1999)). Based on this determination that the contract was ultra vires, we held that H.G. Brown could not "seek whole or partial performance of the contract through mandamus or other means," and even the City's substantial performance under the contract would "not be treated as ratification thereof." Id. at 821-822. Moreover, we held that "the City is not estopped from asserting the contract's invalidity, even though the Partnership has performed its part of the bargain and might even have relied upon the contract to its detriment." Id. at 822.

*H.G. Brown* did not involve a claim for quantum meruit,[2] but if H.G. Brown had sought to recover under that theory, the result

---

[2] H.G. Brown apparently did not seek quantum meruit relief, perhaps because of our earlier decision in *PMS Construction* or the potential defense of municipal immunity, see footnote 1 above.

clearly would have been no different. Quantum meruit is a quasi-contractual remedy, see *City of Calhoun v. N. Ga. EMC*, 264 Ga. 205, 208 (443 SE2d 469) (1994), and in *H.G. Brown*, we emphasized that an ultra vires agreement can be given no legal effect whatsoever, "even quasi-contractually":

> To allow the [ultra vires] agreement to appear effective in any sense, even quasi-contractually . . . would amount to permitting the local government to expand its own powers rather than requiring it to rely upon state legislative delegation. Indeed, this would annul the limitation itself and sanction the local governments accomplishing indirectly that which it could not directly achieve. From this . . . it would be but a short step to governmental extravagance with resulting unreasonable risks and liabilities being heaped upon the shoulders of local taxpayers. A strict rule of absolute nullity, therefore, will nip these dangerous tendencies at the outset and, viewed in this light, is "consistent with principles of equity and fair dealing."

*H.G. Brown*, 278 Ga. at 822 (quoting R. Perry Sentell, Jr., *Studies in Local Government Law* 545 (3rd ed. 1977)).

(b) In this case, the Court of Appeals held that *H.G. Brown* and *PMS Construction* did not bar W&C's quantum meruit claim against the City based on the June Proposal. The Court of Appeals cited several decisions it had issued after *PMS Construction* but before *H.G. Brown*, which distinguished *PMS Construction* and allowed quantum meruit recovery against municipalities even though the requirements for entering contracts prescribed by the city's charters apparently were not met. See *City of Baldwin*, 316 Ga. App. at 771 (citing *Walston & Assoc. v. City of Atlanta*, 224 Ga. App. 482, 484 (480 SE2d 917) (1997); *City of Dallas v. White*, 182 Ga. App. 782, 783 (357 SE2d 125) (1987); and *City of St. Marys v. Stottler Stagg & Assoc.*, 163 Ga. App. 45 (292 SE2d 868) (1982)). Those decisions were based on the premise that there are "no 'statutory requirements' for establishing a contract with a municipality which are comparable to those cited in *PMS Const. Co.* as precluding a quantum meruit recovery against a county." *Stottler*, 163 Ga. App. at 47. The Court of Appeals concluded that *H.G. Brown* had not impliedly overruled *Stottler*, and that quantum meruit recovery was available against the City of Baldwin, because "there are still no statutory requirements for establishing a contract with a city." *City of Baldwin*, 316 Ga. App. at 772.

The reasoning of the Court of Appeals expressed in *Stottler* and carried forward to this case is erroneous. Like the statute at issue in

*PMS Construction*, municipal charters are originally enacted by the General Assembly, and their provisions, including those related to the municipality's method of contracting, have the force of law. This Court made just this point in *H.G. Brown*, explaining that because a city "may only exercise power to the extent it has been delegated authority by the state," 278 Ga. at 819,

> [w]here a city charter specifically provides how a municipal contract shall be made and executed, the city may only make a contract in the method prescribed; otherwise, "the contract is invalid and unenforceable." A municipality's method of contracting, once prescribed by law or charter, is absolute and exclusive.

Id. at 820 (citations omitted). See also OCGA § 36-31-5 (describing the granting of original municipal charters by local law of the General Assembly). Thus, municipal charter provisions regulating the making of city contracts have the same legal effect as the statutory requirements that govern county contracting, and the premise on which the Court of Appeals relied to distinguish this case from *PMS Construction* was incorrect.

(c) That does not end our analysis of the quantum meruit issue, however. W&C contends that, even if the June Proposal was defective in the way it was executed, it was a contract that the City of Baldwin had the power to enter, and thus the contract was not ultra vires and could support recovery in quantum meruit. W&C cites to the passage in *H.G. Brown* where this Court said:

> The exact status of a defective contract . . . depends upon the type of limitation which the local government has ignored in making it. If the contract was imperfectly or irregularly executed, it may not necessarily be completely ineffective, as long as it was the type of contract within the power of the local government to make. But if the limitation ignored was one which placed the contract completely beyond the power or competence of the local government, then the contract will be termed ultra vires, and its status is an absolute nullity.

278 Ga. at 820 (citation omitted). As W&C points out, there is a line of Georgia cases recognizing the distinction between a municipality's ultra vires acts — acts done with " 'the total absence or want of power' " — and the " 'irregular exercise of a granted power,' " which

may expose a city to equitable relief. E.g., *City of Summerville v. Ga. Power Co.*, 205 Ga. 843, 846 (55 SE2d 540) (1949) (citation omitted).[3]

These cases are useful in understanding the difference between an act done without legal authority and a mere procedural irregularity in the exercise of lawful authority, but they do not limit the doctrine of ultra vires municipal contracts solely to agreements that *the city* had no power to enter. As *H.G. Brown* illustrates and explains, a purported municipal contract may also be void and absolutely ineffective where *the city took no action at all* and the ultra vires act was that of one or more *city officials* who acted completely beyond their power to bind the city. Thus, in the commonplace situation where a charter or other governing law requires a municipality to approve all or certain contracts through majority vote of the city council, " '[t]he governing body . . . must act at a legal meeting and as a board, since the individual members acting singly have no authority to bind the municipality.' " *H.G. Brown*, 278 Ga. at 821 (citation omitted).

In other words, the problem with W&C's June Proposal is not that the City of Baldwin lacked the legal authority to enter such a contract; the City had that power. Neither is the concern a mere procedural irregularity; we do not hold that the June Proposal was ultra vires because it was not reviewed by the city attorney or because the Mayor failed to date the proposal at the time he signed it. The fundamental defect of the June Proposal is that *the City* never approved it. Instead, the proposal was discussed with and signed by *the Mayor*, who had no unilateral authority to approve contracts that would bind the City of Baldwin, because the City Charter plainly says that "[n]o contract with the city shall be binding on the city unless the contract . . . is approved by the city council."[4] It is undisputed that the

---

[3] In *City of Summerville*, for example, this Court held that Georgia Power could seek to recover under an equitable estoppel theory similar to quantum meruit for the value of the electricity distribution system the utility company had constructed and maintained for the city for over 20 years under the grant of a franchise to do so. See 205 Ga. at 845, 847. The city had the authority under its charter to grant such a franchise, but the city council had done so without complying with the charter's requirement that a notice of application for the franchise be posted at the county courthouse door for ten days and published in the official county gazette for two weeks. See id. at 843. Because the city council had the power to grant the franchise, and the council had in fact granted the franchise, the franchise was not ultra vires, despite the procedural irregularity. See id. at 847.

[4] Two City Council members attended the August 20, 2009 meeting where Mayor Kelley signed the June Proposal; however, even assuming the June Proposal was discussed with them, a point on which the evidence was conflicting, there is no evidence that they ever voted on or otherwise approved the proposal. But even if they had, the two of them are only a minority of the five-member City Council.

City Council never approved the June Proposal, and thus the proposal was ultra vires and void. In this situation, recovery under an equitable doctrine like quantum meruit or estoppel is not allowed, "even though the [party seeking damages] has performed its part of the bargain and might even have relied upon the contract to its detriment." *H.G. Brown*, 278 Ga. at 821. See also id. at 822, n. 23 (distinguishing cases in which a municipality was held estopped to dispute a contract's validity, where the city council approved the contract at issue by majority vote at an open meeting); OCGA § 50-14-1 (b) (2) (Georgia Open Meetings Act provision stating that any "official action" taken by a city council at a meeting that is not open to the public after due notice "shall not be binding"); § 50-14-3 (b) (same for votes on matters initially allowed to be considered in executive session).

Indeed, when understood in this way, the application of the ultra vires doctrine in this situation aligns with the statute and cases holding that the power of public officials in Georgia is limited by the laws that prescribe their authority and that it is the duty of parties dealing with those officials to determine that they are acting within their lawful authority. See OCGA § 45-6-5 ("Powers of all public officers are defined by law and all persons must take notice thereof. The public may not be estopped by the acts of any officer done in the exercise of an unconferred power."); *City of Warner Robins v. Rushing*, 259 Ga. 348, 348-349 (381 SE2d 38) (1989) (relying on OCGA § 45-6-5 to hold that the mayor's action of unilaterally lowering water and sewer rates, on which customers relied to their detriment, violated the city charter provision requiring the rates to be set by the city council and therefore the city could not be estopped from collecting on the significantly higher rate in effect before the mayor's action); *Wiley v. City of Columbus*, 109 Ga. 295, 296 (34 SE 575) (1899) ("[W]hen authority is delegated by the legislature to a municipality to enter into contracts in a certain specified manner, it becomes the duty of any person dealing with such municipality in a contractual relation to see that there has been a compliance with the mandatory provisions of the law limiting and prescribing its powers.").

Adherence to these longstanding principles is essential to protect the rule of law and the interests of taxpaying citizens. If a municipal charter or other governing law says that only the city council, by majority vote, can approve a contract that binds the city — and thereby commit the city and its taxpayers to pay under the contract — that is how contracts must be approved if the contract is to be enforceable directly or through equitable remedies. See *H.G. Brown*, 278 Ga. at 822. The actions of individual city officials who are not empowered to act on behalf of the city in such matters cannot be relied

upon by others to commit the government's resources, regardless of good intentions. Accordingly, to the extent that *Walston*, 224 Ga. App. at 484, *City of Dallas*, 182 Ga. App. at 783, and *Stottler*, 163 Ga. App. at 47, stand for the proposition that quantum meruit recovery is allowed under such circumstances, those cases are overruled.

(d) To summarize, through its charter, the City of Baldwin provides notice to everyone doing business with the City that "[n]o contract shall be binding on the city, unless the contract . . . is approved by the city council." Charter § 6-9. The City Council may act only by the "affirmative vote of three [of the five] members of the council," Charter § 2-8, and the Mayor gets a vote only "in the case of a tie vote among the council members voting," Charter § 2-13. These are substantive requirements of law, and without compliance with them, "a valid contract cannot be created." *H.G. Brown*, 278 Ga. at 821. W&C was required by law to be cognizant of these limitations on the authority of the City and its officials, see OCGA § 45-6-5, and the record shows that W&C was in fact aware of the need for council approval of the June Proposal. On August 19, 2009, W&C reminded the City by e-mail that this requirement was not yet met, and Mayor Kelley testified without contradiction that when he signed the June Proposal at the August 20 meeting with Bill King from W&C, he declined to date the document and told King that he did not have the authority to obligate the City by himself and the proposal would not go into effect until it had been voted on by the City Council. However, the June Proposal was never approved by the City Council, only by an official — the Mayor — who had no authority to unilaterally bind the City to contracts. The June Proposal was therefore ultra vires, not because of any irregularities in the process leading to its signing by the Mayor, but because the Mayor executed it "with a total absence of power" and the City never entered it at all. Thus, the trial court properly held that the June Proposal was ultra vires and not a binding contract, but that court and the Court of Appeals erred as a matter of law in ruling that W&C could still recover in quantum meruit for work done under the proposal.

3. Because the jury's verdict did not specify whether its award of $203,000 in damages to W&C was based on quantum meruit under the ultra vires June Proposal or breach of contract or quantum meruit under the May Agreement, which the City does not contend was ultra vires, we must decide whether the May Agreement can support the verdict. The Court of Appeals ruled that it could, see *City of Baldwin*, 316 Ga. App. at 774, but we disagree.

The City argued in the trial court and on appeal that the May Agreement could not be interpreted to include the work described in

the June Proposal. Relying on the "any evidence" standard of appellate review, the Court of Appeals rejected the City's argument and held that the trial court properly allowed this breach of contract claim to go to the jury. See id. However,

> [t]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Record Town, Inc. v. Sugarloaf Mills Ltd. Partnership of Ga.*, 301 Ga. App. 367, 368 (687 SE2d 640) (2009) (citation omitted). Because the first two of these steps involve questions of law, the trial court's application of them is reviewed de novo on appeal. See *McKinley v. Coliseum Health Group, LLC*, 308 Ga. App. 768, 770 (708 SE2d 682) (2011).

Here, the scope of the May Agreement is clear on its face: the contract is for W&C's provision of "the supporting engineering documents for [the City's] funding application" in exchange for a "Lump Sum fee of $5000." W&C points to the subsequent sentence indicating that W&C "will be preparing a scope, budget, and schedule for the actual design work" for the plant improvements as including that work in the contract. But that sentence is prefaced with the statement that those materials would be submitted to the City "[u]nder separate covers" and is followed by the statement that "[a]dditional engineering fees will *only be contracted* once funding has been committed." Read as a whole, the agreement plainly undermines W&C's contention that the May Agreement authorized W&C to go ahead and hire a surveyor, design the plant improvements, advertise bids for the project, and meet with bidders, and to charge the City fees of more than $200,000 — 400 times greater than the $5,000 amount specified in the agreement — all for a project that would cost nearly $2,000,000 yet had never been detailed in any document provided to the City.

The trial court and the Court of Appeals identified no ambiguity as to the scope of the May Agreement, and we see none. But even if there were some uncertainty, we would find it resolved by the way

W&C itself treated the May Agreement and June Proposal before this dispute arose — as two separate contracts. See *Head v. Scanlin*, 258 Ga. 212, 214 (367 SE2d 546) (1988) (" 'The construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to *much weight and may be conclusive upon them*.' " (citation omitted)). After completing the work related to the City's funding application and submitting an invoice for the $5,000 fee set forth in the May Agreement, W&C stopped work on the project and submitted a new document — the June Proposal — to the City on June 15. The document was labeled a "Proposal" and said that W&C would need authorization from the City to proceed with the "services outlined in this Proposal," which included not only the topic mentioned in the "[u]nder separate covers" sentence of the May Agreement (W&C's design of the plant improvements) but also services W&C now claims were also contracted for in the May Agreement despite not being mentioned there at all (such as advertising bids, meeting with the bidders, and hiring surveyors and geo-technical core drillers). The June Proposal also said that the Mayor should review the proposal, call W&C to discuss any questions or comments, and if "everything is in order," sign it to authorize W&C to proceed. The June Proposal makes no explicit reference to the May Agreement, much less suggest that the extensive and expensive work outlined in the proposal is something to which the parties had already agreed in a prior contract.

Moreover, on August 19, 2009, W&C informed the City that the work outlined in the June Proposal still needed approval by the City Council, which would have been unnecessary if that work was already covered by the May Agreement approved by the Council. Finally, the invoices that W&C sent to the City for the May Agreement and the June Proposal contained different project numbers, and the November 2009 invoice listing work done on the plant improvements said that the work was done "*in accordance with our contract dated June 15, 2009.*"

Given this evidence, it is no surprise that in its complaint, W&C expressly alleged that it had *two* contracts with the City, one entered in May and the other in June. W&C later admitted it was paid the $5,000 due under the May Agreement, and the trial court granted summary judgment to the City on that breach of contract claim. It was only later, after the trial court correctly ruled that the June Proposal was ultra vires, that W&C tried to say that the May Agreement encompassed all of its work. But that contract cannot bear such an interpretation.

Accordingly, we conclude as a matter of law that the May Agreement was a contract for the City to pay W&C $5,000 for its work

related to the funding application. The "under separate covers" sentence of the May Agreement did contemplate a possible future contract — one to be submitted "separate[ly]" — by which the parties would agree on the services that W&C would provide regarding the actual design and construction of the plant improvements along with the price that the City would pay W&C for those services. That language, however, was nothing more than an agreement to negotiate a future contract, which imposed no binding obligations on the parties. See *Newman v. Newman*, 291 Ga. 635, 636 (732 SE2d 77) (2012) (noting that "a contract to enter into a contract in the future is of no legal effect"); *Hartrampf v. C & S Realty Investors*, 157 Ga. App. 879, 881 (278 SE2d 750) (1981) (holding that a writing saying that at some future date, a lender would loan a borrower "no more than $1,100,000" and that the maturity date would be "no longer than 6 years" was nothing more than an agreement to enter into a contract in the future and was therefore unenforceable).

Although the City made this argument in its briefs on appeal, the Court of Appeals did not closely examine the language of the May Agreement with respect to its scope and whether its latter portion was merely an unenforceable agreement to agree on future services. Instead, the court focused on cases in which the parties had negotiated a contract that contained an uncertain price term that could be clarified by the parties' past dealings or because the contract provided guidelines for determining the price. See *City of Baldwin*, 316 Ga. App. at 774-775. We have considerable doubt that the parties' past dealings or the May Agreement provided sufficient guidelines for determining the price term for W&C's extensive and varied work beyond its providing the supporting engineering documents for the City's funding application, but we need not rely on that point to decide that the May Agreement was not a contract for the work that W&C actually did under the ultra vires June Proposal.

Finally, because the May Agreement was plainly a contract by which the City would pay W&C $5,000 to provide supporting engineering documents for the City's stimulus funding application, it does not support a claim that the City requested or knowingly accepted the additional services that W&C provided or that W&C reasonably expected to be paid more than $200,000 for those uncontracted-for services. Thus, W&C's claim for quantum meruit for work done under the May Agreement also fails as a matter of law.

*Judgment reversed. All the Justices concur.*

DECIDED MAY 20, 2013.

*Hulsey, Oliver & Mahar, Jessica M. Lund, R. David Syfan*, for appellant.

*Oliver & Weidner, James C. Weidner, Ernest H. Woods III*, for appellee.

*Rusi C. Patel, Susan J. Moore*, amici curiae.