HONORABLE LEIGH MARTIN MAY, UNITED STATES DISTRICT JUDGE
*1371 This matter is before the Court on Plaintiff Super98, LLC's Motion for Summary Judgment [59]. After due consideration, the Court enters the following Order:
I. BACKGROUND[1]
On September 24, 2014, the parties signed an agreement where Defendant agreed to buy and Plaintiff agreed to sell up to 117 Super98 drag reduction devices ("Systems") for Defendant's MD-88 aircraft ("Agreement"). Dkt. No. [7249] ¶¶ 1-3. Starting in November 2014, Defendant began issuing Purchase Orders for Systems, culminating in a consolidated Service Purchase Order for 117 Systems in early 2015. Id. ¶¶ 4-6. On or about November 12, 2015, Defendant asked Plaintiff to stop shipping additional Systems until Defendant could calculate the average Performance Improvement of the first ten Systems. Id. ¶ 17. By that time, Plaintiff had delivered 42 Systems to Defendant and procured most of the components necessary to complete delivery on the remaining 75 Systems from the Purchase Orders. Id. ¶ 20. Defendant contends that the Performance Improvement calculation showed that the Performance Improvement of the first ten Systems fell short of the 2.5% fuel savings guaranteed by the Agreement. Id. ¶¶ 29-30; Dkt. No. [85] 14.
Defendant canceled the Purchase Orders for the 75 undelivered Systems and alleges that the delivered Systems did not provide sufficient Performance Improvement as guaranteed in the Agreement. Dkt. No. [72-49] ¶¶ 22, 30.
The parties disagree as to how Performance Improvement was supposed to be calculated. Defendant contends that at the time of the Agreement it believed that the Performance Improvement Guarantee applied to mission fuel mileage, while Plaintiff alleges that it only applied to cruise fuel mileage. Dkt. No. [85] ¶¶ 7, 9. "Mission" fuel mileage measures the mileage of the entire flight from takeoff to landing, while "cruise" fuel mileage only measures the mileage when the aircraft operates at a steady, high altitude. Id. ¶¶ 1, 5.
Defendant contends that the cruise/mission issue is an essential element to the contract because other Agreement provisions are related to the Performance Improvement Guarantee[2] and it would not have entered into the Agreement if the Performance Improvement Guarantee only applied to cruise fuel mileage. Dkt. Nos. [72] at 10; [85] ¶ 5. Defendant further contends that because there was no meeting of the minds on an essential element of the Agreement, the Agreement is invalid. Dkt. No. [72] at 17, 18.
Defendant notes that during discussions on earlier versions of the Agreement, Plaintiff represented to Defendant that the Performance Improvement Guarantee applied to mission fuel mileage. Dkt. No. [85] ¶¶ 1, 4, 12. However, Plaintiff maintains that because the Agreement itself unambiguously defines Performance Improvement with reference to cruise fuel mileage, any prior representations are parol evidence that should not be considered in *1372 determining whether there was a meeting of the minds, particularly in light of the Agreement's Integration Clause.[3] Id.
The parties also disagree on whether Defendant is bound by the Purchase Orders and therefore owes Plaintiff for the 75 undelivered Systems. Defendant alleges that it is not bound by the Purchase Orders because the delivered Systems did not provide sufficient Performance Improvement, and therefore Defendant has the right to "discontinue the purchase of Systems" under the Agreement. Dkt. Nos. [60-1] at 6; [72] at 19-20. Plaintiff argues that even if the Systems did not provide sufficient Performance Improvement, Defendant's right to "discontinue the purchase of Systems" under the Agreement only applies to future Purchase Orders, and therefore Defendant must pay for the 75 undelivered Systems. Dkt. No. [60] at 19.
In addition, the parties disagree on whether the Performance Improvement Guarantee and its related Price Reduction apply to partially-installed Systems. This is relevant because while Defendant has stated it will pay for the 42 delivered Systems, Dkt. No. [85] ¶ 22, Plaintiff alleges that Defendant did not fully install 25 of the 42 delivered Systems and therefore should not be able to receive a price reduction on those Systems. Dkt. No. [60] at 18, 19. The parties further differ on whether Defendant can delay payments owed to Plaintiff by delaying Systems installation, and whether Defendant can set-off payments owed.
On May 12, 2016, Plaintiff filed a complaint asserting breach of contract, promissory estoppel, and unjust enrichment/restitution. Dkt. No. [1]. On July 12, 2017, Plaintiff filed a Motion for Summary Judgment. Dkt. No. [59].
II. LEGAL STANDARD
Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).
The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). The moving party's burden is discharged merely by " 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 at 325, 106 S.Ct. 2548. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).
*1373 Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).
III. DISCUSSION
Plaintiff seeks summary judgment on four issues: (1) that Defendant is bound by the 117 Purchase Orders it issued to Plaintiff; (2) that the Performance Improvement Guarantee does not apply to uninstalled or partially-installed Systems; (3) that Defendant cannot delay payments by delaying Systems installation; and (4) that Defendant cannot set-off payments owed.[4] However, before the Court addresses these contract claims, it will first analyze whether the Agreement itself is a valid and enforceable contract as a matter of law.
a. Validity of the Agreement
Defendant argues that because there was no meeting of the minds on whether Performance Improvement should be calculated using cruise or mission fuel mileage, there is a genuine issue of fact on the Agreement's enforceability which precludes summary judgment in Plaintiff's favor.
"Unless and until there is a meeting of the minds as to all essential terms, a contract is not complete and enforceable." TranSouth Fin. Corp. v. Rooks, 269 Ga.App. 321, 604 S.E.2d 562, 564 (2004). This applies to contracts for the sale of goods under Article 2 of Georgia's Uniform Commercial Code. AgriCommodities, Inc. v. J.D. Heiskell & Co., 297 Ga.App. 210, 676 S.E.2d 847, 850-51 (2009). In deciding whether there was a meeting of the minds, courts look to the contract's express language, as well as to relevant extrinsic evidence of correspondence and discussions. Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n, 250 Ga. 391, 297 S.E.2d 733, 737 (1982). Whether the parties' minds met is generally an issue of fact for the jury to decide. Legg v. Stovall Tire & Marine, 245 Ga.App. 594, 538 S.E.2d 489, 491 (2000).
Plaintiff argues that in analyzing whether there was a meeting of the minds, the Court cannot consider pre-Agreement representations Plaintiff made to Defendant because the Agreement itself is unambiguous and manifests the parties' intent. However, the Court can look at parol evidence even if the contract's express language is unambiguous if the parol evidence is used to show that no valid agreement ever went into existence. See Patterson v. CitiMortgage, 820 F.3d 1273, 1276-77 (11th Cir. 2016) ; Moreno v. Smith, 299 Ga. 443, 788 S.E.2d 349, 352 (2016) ; BellSouth Advert. v. McCollum, 209 Ga.App. 441, 433 S.E.2d 437, 440 (1993). See also 1 WILLISTON ON CONTRACTS § 33:14 (4th ed. 2017) ("Since the application of the parol evidence rule depends on the existence of a valid integrated contract, the rule does not preclude evidence which contradicts the very existence or validity of an alleged contractual obligation."). In addition, parol *1374 evidence can be considered despite the presence of an integration clause. Extremity Healthcare v. Access To Care Am., 339 Ga.App. 246, 793 S.E.2d 529, 536 (2016). Therefore, the Court will look to both the Agreement's express language and the parties' extrinsic communications to determine whether there was a meeting of the minds.
Although the Agreement's express language supports a finding that the Performance Improvement Guarantee should be calculated using cruise fuel mileage, the language is not sufficiently clear to foreclose other interpretations. Though Section 3.1(a) defines "Performance Improvement" in terms of Exhibit D which makes numerous references to "cruise" fuel mileage, this occurs in the context of Plaintiff's calculation of Performance Improvement. Section 3.1(a) provides that "Seller will provide to Purchaser, prior to the delivery of the first System, flight test data as set forth in Exhibit D, Nominal Performance, which demonstrates the nominal fuel mileage performance improvement (Performance Improvement) resulting from installation of the System." Id. Exhibit D specifically references the "nominal incremental percentage increase in cruise fuel mileage due to installation of the System." Id. at 21 (emphasis added). Exhibit D also refers to "cruise" several times, while not once referring to "mission." Id. at 21-22.
Section 3.1(a) also provides instructions for how Defendant would calculate the Performance Improvement of each installed System. Id. at 6. This is the relevant calculation for the Performance Improvement Guarantee. Id. Specifically, Section 3.1(a) provides that "Performance Improvement for Purchaser's Aircraft with an installed System will be determined by the following methodology:" and then proceeds to list several requirements. Id. Unlike the instructions for Plaintiff's Performance Improvement calculations, Defendant's instructions do not specify whether to use cruise or mission fuel mileage. Id. Instead, it only references "average gallons burned per flight hour" and "fuel consumed on a flight." Id.
In addition, Plaintiff made several pre-Agreement representations to Defendant that Performance Improvement would be measured using mission fuel mileage. First, in a September 12, 2012, email Plaintiff's engineer stated that "[o]ur 2.5% [guarantee] is literally for cruise only." Dkt. Nos. [72-41] at 3, 4; [85] ¶ 11. In an email response that same day, Plaintiff's lead salesman stated: "I suspect you are aware that all of our 'guarantee language' over the past 36 months has actually been considered by the customers to be 'mission average,' not cruise only." Dkt. Nos. [72-41] at 2; [85] ¶ 12. The next day, Plaintiff's Vice President replied to Plaintiff's salesman's response and stated that there was "[n]o need to change our guarantees" as "[o]ur main objective right now is to get to [the] point" where other companies are "measur[ing] our product" because "many of us believe our product will outperform when given an opportunity." Dkt. Nos. [72-41] at 2; [85] ¶ 13. In addition, Plaintiff's December 2013 presentation to Defendant approximately nine months before the finalized Agreement referred to "fuel savings of installed kits (2.50% of MD-88 avg mission fuel)." Dkt. No. [72-3] at 15, 59 (emphasis added).
Plaintiff argues that none of Defendant's extrinsic evidence from prior years pertaining to discussions on earlier Agreement versions casts doubt on the parties' mutual assent at the time of the Agreement. However, Plaintiff does not contend that it ever clarified to Defendant that "cruise" was the proper standard in the months leading up to the Agreement. This is further evidenced by Plaintiff's Vice *1375 President's statement that there was "[n]o need to change our guarantees," despite Plaintiff's knowledge of Defendant's potential "mission" interpretation. Dkt. No. [72-41] at 2. See First Baptist Church of Moultrie v. Barber Contracting Co., 189 Ga.App. 804, 377 S.E.2d 717, 719 (1989) (noting that a contract will be rescinded upon a unilateral mistake if the mistake was made as to a basic assumption upon which the contract was made and the other party had reason to know of the mistake or his fault caused the mistake) (emphasis added).
The Agreement's express language, in combination with extrinsic evidence showing Plaintiff's knowledge of Defendant's "mission" interpretation, creates a jury question on whether there was a meeting of the minds regarding the Performance Improvement Guarantee, and thus whether the Agreement itself is enforceable.
Plaintiff argues that even if the Court finds there was no meeting of the minds on the Performance Improvement Guarantee, that would only invalidate the Performance Improvement Guarantee, not the entire Agreement. Plaintiff notes that in the cases Defendant cites where courts invalidated contracts for lack of agreement, the courts only invalidated a provision of the contracts, not the entire contracts. See Cox, 297 S.E.2d at 737-38 ; Cent. Ohio Graphics, Inc. v. Alco Capital Res., Inc., 221 Ga.App. 434, 472 S.E.2d 2, 4 (1996) (refusing to enforce forum selection clause due to no meeting of the minds). Plaintiff also notes that Section 12-4 of the Agreement contains a severability clause which states: "If any provision of this Agreement is held unlawful or otherwise ineffective by a court of competent jurisdiction, (i) the remainder of this Agreement will remain in effect...." Dkt. No. [60-1] at 13. Thus, according to Plaintiff, the remainder of the Agreement is still enforceable without the Performance Improvement Guarantee.
However, "the severance of an essential term 'is not allowed,' even where the contract contains a severance clause." Miller v. GGNSC, LLC, 323 Ga.App. 114, 746 S.E.2d 680, 688 (2013) (quoting AMB Prop., L.P. v. MTS, Inc., 250 Ga.App. 513, 551 S.E.2d 102, 105 (2001) ). And a term is not severable if it goes to the "essence of the contract." Nolley v. Md. Cas. Ins. Co., 222 Ga.App. 901, 476 S.E.2d 622, 625 (1996).
Here, the Performance Improvement Guarantee is an essential term of the Agreement that goes to the essence of the contract. Both Defendant's determination of price and its option to discontinue purchases flows from the 2.5% Performance Improvement Guarantee. In addition, Defendant asserts that it would not have entered into the Agreement if Plaintiff only guaranteed fuel savings during the cruise portion of the flight because Defendant flies its MD-88 planes on short and medium-haul flights on which much of the fuel is burned during takeoff, ascent, and landing. Dkt. No. [85] ¶ 5. So, because there is a fact question on whether a meeting of the minds occurred as to an essential term of the Agreement, the entire Agreement is potentially unenforceable.
b. The Effect the Agreement's Potential Unenforceability has on Plaintiff's Summary Judgment Issues
Defendant argues that the existence of a jury question on the Agreement's enforceability precludes Plaintiff's Motion for Summary Judgment. However, both parties stated at the hearing that even if there was a jury question on the Agreement's enforceability, it would still be appropriate for the Court to reach the issue of whether Defendant was bound by its 117 Purchase Orders.
*1376 To be sure, that there is a fact question on the Agreement's validity would preclude summary judgment for Plaintiff on the issue of whether Defendant breached the Agreement. See, e.g., Wallace v. Triad Sys. Fin. Corp., 212 Ga.App. 665, 442 S.E.2d 476, 478 (1994) (holding that the trial court erred in granting plaintiff's motion for summary judgment because plaintiff did not meet its burden of showing that no genuine issue of material fact remained on the issue of contract existence).
However, Plaintiff does not seek summary judgment on its entire breach of contract claim, but rather on contract interpretation issues. This is expressly allowed by Rule 56(a) which permits motions for "partial summary judgment" and provides that "[a] party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). See also Brown v. Crawford County, 960 F.2d 1002, 1007 n.6 (11th Cir. 1992) (noting the "usefulness of partial summary judgments in expediting trials by narrowing legal issues and establishing facts not in controversy"). Therefore, the Court will address Plaintiff's remaining issues.[5]
c. Whether Defendant is Bound by the 117 Purchase Orders It Issued to Plaintiff
Plaintiff asks the Court to hold that Defendant is bound by the 117 Purchase Orders it issued to Plaintiff. Defendant argues that it had the right to cancel the Purchase Orders because the Agreement allowed it to discontinue the purchase of Systems when the first Systems did not meet the Performance Improvement Guarantee.
The construction of contracts involves three steps: (1) if the language is clear and unambiguous, the court simply enforces the contract according to its clear terms, and the contract alone is looked to for its meaning; (2) if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity; and (3) if the ambiguity remains after applying the construction rules, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. City of Baldwin v. Woodard & Curran, Inc., 293 Ga. 19, 743 S.E.2d 381, 389 (2013). The first two steps involve questions of law. Id.
The Performance Improvement Guarantee in Section 3.1(b) of the Agreement guarantees a 2.5% Performance Improvement and enforces that guarantee with a Discontinue Clause. The provision states:
Seller guarantees to Purchaser that there will be a 2.5% Performance Improvement for each Aircraft with an installed System. Purchaser, in its sole discretion, shall have the option to discontinue the purchase of Systems if the aggregate Performance Improvement of the first ten Systems that are installed is less than 2.5% for the three-month period following installation.
Dkt. No. [60-1] at 6 (emphasis added).
Defendant argues that it is not bound by the Purchase Orders to the extent it could discontinue the purchase of Systems when it determined that the Performance Improvement Guarantee was not satisfied by the first ten Systems. In contrast, Plaintiff argues that the Discontinue Clause only allows Defendant to stop purchasing addi tional *1377 Systems, as opposed to canceling prior System orders.
Defendant argues that its interpretation is reasonable in light of the Discontinue Clause's plain meaning. In particular, Defendant notes that to "discontinue" is "to stop doing or providing something." Dkt. No. [72] at 16. And a purchase cannot be "discontinued" before it has been started, particularly when Defendant was under no obligation to purchase a set number of Systems. Dkt. No. [60-1] at 4. Therefore, Defendant contends that the right to discontinue cannot apply to additional purchases because, as those purchases have not been made, there is nothing to stop. Defendant argues that interpreting discontinue to refer to prior purchases is further bolstered by the fact that, under the Agreement, a purchase was a multi-step process that took roughly two years to complete after the initial Purchase Order. Id. at 7.
Plaintiff contends that the Discontinue Clause only applies to additional purchases. Plaintiff contends the Agreement contemplates that Defendant would purchase up to 117 Systems and increases each System's price if Defendant fails to purchase at least 102 Systems. See id.; id. at 7. Therefore, Plaintiff argues there was an expectation, though not a requirement, that Defendant would purchase a large number of Systems. So, Defendant's refusal to purchase additional Systems if Performance Improvement was not met could constitute "discontinu[ing]" relative to the Agreement's expectations. Plaintiff argues its interpretation also avoids the uncertainty that Defendant's interpretation creates because of the Agreement's unique nature, Performance Improvement Guarantee, and two-year payment plan. Id. For example, it is unclear whether Defendant's interpretation would allow Defendant to cancel prior orders up until final payment was due more than two years after installation, or only within a reasonable time after testing revealed that Performance Improvement was not met based upon the first ten Systems' aggregate performance.
Because each interpretation is a reasonable reading of the Discontinue Clause, the Clause is neither clear nor unambiguous. Therefore, the Court will look to rules of contract construction to resolve the ambiguity.
Defendant contends that Plaintiff's interpretation of the Discontinue Clause renders Article 1 of the Agreement redundant. Georgia law prohibits an interpretation that would render another contract provision redundant. Estate of Pitts v. City of Atlanta, 323 Ga.App. 70, 746 S.E.2d 698, 706 (2013) ; Duke Galish, LLC v. Manton, 308 Ga.App. 316, 707 S.E.2d 555, 558 (2011). Specifically, Defendant argues that Plaintiff's interpretation giving Defendant the right to cancel additional purchases renders Article 1 redundant because Article 1 already gives Defendant that right as it expressly imposes no obligation on Defendant to place any orders at all. See Dkt. No. [60-1] at 4 ("Purchaser agrees to purchase from Seller up to 117 [Systems].") (emphasis added).
However, Plaintiff's interpretation does not necessarily render Article 1 redundant because discontinuing the purchase of Systems affects the price under Section 4.1.2 in a way that declining to purchase Systems to begin with does not. Section 4.1.2 states: "The Price shall be increased by ten percent (10%) if less than 102 Systems are purchased by Purchaser, except when fewer than 102 Systems are purchased pursuant to Section 3.1(b) ...." (emphasis added). Therefore, Section 3.1(b) may allow Defendant to discontinue the purchase of additional Systems without suffering a price increase, whereas Article 1 may allow Defendant to decline to purchase Systems subject to a price increase on the *1378 Systems it does purchase. Thus, the construction rule against redundancy is not helpful in resolving the ambiguity.
Plaintiff looks to another construction rule and argues that "discontinue" cannot allow the cancellation of prior orders because the Agreement uses the term "terminate" in that context, such as in Section 6.4's Delay Clause. And "when parties to the same contract use such different language to address parallel issues ... it is reasonable to infer that they intend this language to mean different things." Taracorp, Inc. v. NL Industr., Inc., 73 F.3d 738, 744 (7th Cir. 1996). See also Forsyth County. v. Waterscape Servs., LLC, 303 Ga.App. 623, 694 S.E.2d 102, 110 (2010) ("[P]arts of a contract must be read in conjunction with one another so as to harmonize the various parts.").
Section 6.4 of the Agreement provides: "In the event of an Excusable Delay affecting either party ... the party not experiencing the Excusable Delay may elect to terminate any System so delayed by promptly giving written notice to the other." Dkt. No. [60-1] at 9 (emphasis added). In contrast, Section 3.1(b) allows Defendant to discontinue the purchase of Systems if Performance Improvement is not met. Plaintiff argues that because the word "terminate" applies to canceling prior orders in the delay context, if the parties wanted Defendant to have that right in the Performance Improvement context, the Agreement would have used "terminate" instead of "discontinue" in Section 3.1(b).
However, Defendant argues that Sections 3.1(b) and 6.4 are distinct and should not be conflated. Defendant notes that the termination in Section 6.4 deals with a single "System" if the delivery is delayed. In contrast, the discontinuation in Section 3.1(b) deals with plural "Systems" and is only exercisable after the first ten Systems have been purchased and tested, as opposed to their delivery dates. This is relevant because the more distinct the provisions are, the less "parallel" they are and the less weight the construction rule holds. See Taracorp, 73 F.3d at 744 (applying the construction rule "when parties to the same contract use such different language to address parallel issues") (emphasis added). And the Discontinue and Delay Clauses are less "parallel" than the parallel issues in Taracorp which consisted of indemnification obligations regarding two different facilities. Id. Therefore, because the two provisions are not clearly parallel, the Court gives less weight to this parallel provision construction rule.
Plaintiff also argues that Defendant's interpretation leads to inequitable results where Defendant could order all 117 Systems, forcing Plaintiff to begin manufacturing the Systems to meet Defendant's delivery schedule, and then cancel under the Discontinue Clause, leaving Plaintiff with uncompensated costs. Plaintiff argues this violates the principle that courts should "endeavor to give a construction most equitable to the parties, and one which will not give one of them an unfair or unreasonable advantage over the other." Hutto v. Snap-On Tools Corp., 71 Ga.App. 245, 30 S.E.2d 510, 511 (1944).
However, the extent to which Defendant's interpretation is inequitable or that such a risk was not assumed is debatable. In addition, the mere fact that a contract may seem inequitable is not always enough to justify an alternate construction. See also 17A C.J.S. Contracts § 421 (2017) ("Where possible, a reasonable equitable construction will be given a contract; however, harsh terms may not be ignored, contrary to the clear meaning of the language used and the parties' intention."); 11 WILLISTON ON CONTRACTS § 32:11 (4th ed. 2017) ("Thus, the courts will not indulge in *1379 artificial interpretations ... in order to save a party from a bad bargain").[6]
Because the Discontinue Clause's ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. City of Baldwin, 743 S.E.2d at 389. Accordingly, Plaintiff's Motion for Summary Judgment is DENIED as to whether Defendant was bound by the Purchase Orders.
d. Whether the Performance Improvement Guarantee Applies to Uninstalled or Partially-Installed Systems
Plaintiff asks the Court to hold that the Performance Improvement Guarantee and its related Price Reduction only apply to fully-installed Systems, and therefore Defendant cannot use the Price Reduction on the Systems it only partially installed.
Plaintiff alleges that Defendant did not fully install 25 of the 42 delivered Systems. Dkt. No. [60] at 18, 19. And of those 25 partially-installed Systems, Plaintiff alleges that Defendant did not install Plaintiff's door skids on 22 Systems. Id. at 19.
Plaintiff argues that the Agreement is clear that the Performance Improvement Guarantee and related Price Reduction only apply to fully-installed Systems. The Performance Improvement Guarantee described in Section 3.1(b) states in part: "Seller guarantees to Purchaser that there will be a 2.5% Performance Improvement for each Aircraft with an installed System. " Dkt. No. [60-1] at 6 (emphasis added). In addition, the Price Reduction in Section 4.1.1. provides: "The Price shall be reduced for Systems that do not provide a 2.5% Performance Improvement...." Id. (emphasis added). Moreover, Article 1 of the Agreement defines "System" as the "[d]evices and associated modification subkits described in Exhibit C and Customer Support Documents." Id. at 4. And Exhibit C to the Agreement contains a break-down of the fourteen essential components of the System. Id. at 20. Thus, the Court finds that the Agreement clearly and unambiguously provides that the Performance Improvement System and related Price Reduction only apply to fully-installed Systems.
Defendant argues that whether its decision not to fully install the Systems waived the Price Reduction is a fact question for the jury. However, while the extent to which Defendant did not fully install Systems is a fact question for the jury, the Court can still decide as a matter of law the related contract interpretation issue, namely whether the Performance Improvement Guarantee and Price Reduction apply to partially-installed Systems.
Defendant also argues that Plaintiff did not mention that Defendant failed to fully install certain Systems in Plaintiff's statement of material facts, and therefore the Court cannot consider it. See LR 56.1B(1)(d) ("The Court will not consider any fact set out only in the brief and not in the movant's statement of undisputed facts."). However, even if the Court cannot consider the fact of whether Defendant failed to fully install Systems, the Court can still decide whether the Performance Improvement Guarantee and Price Reduction apply to partially-installed Systems as a matter of contract construction.
Defendant further contends that because Plaintiff did not allege in its Complaint that Defendant breached the Agreement by failing to install the door skids, the Court cannot entertain the issue on summary judgment. However, Plaintiff is not contending that Defendant breached *1380 the contract in this way. Instead, Plaintiff is merely asserting that Defendant is not entitled to a discount on a System unless it was fully installed.
Finally, Defendant argues that it did not install the door skids because they were defective, in violation of the Agreement's Warranty. Dkt. No. [60-1] at 24-25. However, whether Plaintiff violated the Warranty is a separate issue from whether the Performance Improvement Guarantee and Price Reduction apply to partially-installed Systems.
The Agreement clearly and unambiguously provides that the Performance Improvement System and related Price Reduction only apply to fully-installed Systems. Accordingly, Plaintiff's Motion for Summary Judgment is GRANTED as to whether the Performance Improvement Guarantee applies to partially-installed Systems.
e. Whether Defendant Can Delay Payments by Delaying Installation
Plaintiff asks the Court to hold that under the Agreement Defendant cannot delay payments to Plaintiff by unilaterally delaying Systems installation. Defendant argues that because the Agreement was never modified to include a proposed induction schedule, a jury question exists on whether the parties intended for Defendant to be bound by any proposed schedules.
Exhibit A of the Agreement includes only a blank proposed induction schedule. Dkt. No. [60-1] at 16. However, Plaintiff contends that after the parties signed the Agreement, Defendant sent Plaintiff a proposed induction schedule that ultimately became the final delivery schedule ("Final Schedule"). Dkt. No. [59-7] at 3-9.
Plaintiff alleges that Defendant delayed payments by delaying installation after the Systems were timely delivered according to the Final Schedule in violation of Section 5.1.4 of the Agreement. Dkt. No. [60] at 27. Section 5.1.4 provides: "Should Purchaser delay installation from the proposed induction schedule (if an Unexcused Delay), Purchaser shall make payment on the Systems for which installation was delayed as if the Systems were installed pursuant to the proposed induction schedule." Dkt. No. [60-1] at 8.
Plaintiff contends that though the Agreement itself does not include a proposed induction schedule, the Final Schedule is a clear extension of Exhibit A of the Agreement, and is also incorporated in the Agreement via Section 12.9. Section 12.9 states that "references to this Agreement shall be deemed to include all Exhibits to this Agreement, and all related documents. " Id. at 14 (emphasis added). Plaintiff contends that this is also in line with Georgia law which provides that contracts may be supplemented by "evidence of consistent additional terms." O.C.G.A. § 11-2-202.
Defendant argues that it did not improperly delay payments to Plaintiff under Section 5.1.4 because there is no "proposed induction schedule" recognized in the Agreement. Defendant notes that the proposed induction schedule in the actual Agreement is blank, and the parties did not amend the Agreement to include any of Defendant's subsequent proposed schedules. Therefore, Defendant argues that whether the parties intended Defendant to be bound by the Final Schedule is a jury issue.
However, even if there is a jury question on whether the parties intended to be bound by the Final Schedule,[7] the Court *1381 can still decide whether Defendant can delay payments by delaying installation as a matter of contract construction. Section 12.9 states that the Agreement includes exhibits "and all related documents." Dkt. No. [60-1] at 14. If a jury finds that the parties intended to be bound by the Final Schedule, then the Final Schedule would constitute a "related document" and thus part of the Agreement under Section 12.9. And since the Final Schedule would be part of the Agreement, Section 5.1.4 would bar Defendant from delaying payments to Plaintiff by delaying System installations relative to the Final Schedule.
The Court finds that, should a jury determine that the parties intended to be bound by the Final Schedule, the Agreement does not allow Defendant to delay payments by delaying the installation date relative to the Final Schedule. Accordingly, Plaintiff's Motion for Summary Judgment is GRANTED as to whether Defendant can delay payments by delaying the installation date.
f. Whether Defendant Can "Set-off" Payments Owed Under the Agreement
Plaintiff asks the Court to hold that the Agreement does not allow Plaintiff to set-off or recoup payments owed under the Agreement. Defendant argues that the Agreement's provision prohibiting "set-offs" does not apply to "recoupment."
The Agreement specifically provides that "[a]ll payments required under this Agreement will be made in full without set-off or counterclaim." Id. at 8. Plaintiff alleges that Defendant has withheld at least $500,000 in payments Defendant owes to Plaintiff. Dkt. No. [60-19] at 2-3. Plaintiff argues that though Defendant characterized its withholding as a "recoupment," a recoupment is a type of set-off and is therefore also not allowed under the Agreement. See Crow v. Mothers Beautiful Co., 115 Ga.App. 747, 156 S.E.2d 193, 194 (1967) ("Recoupment differs from set-off in this: The former is confined to the contract on which the plaintiff sues, while the latter includes all mutual debts and liabilities.").
However, recoupment is not a subset of set-offs; rather, it is a distinct type of claim. "Under Georgia law, a set-off is a counter-demand which a defendant holds against a plaintiff, arising out of a transaction extrinsic or independent of the plaintiff's cause of action. " Automated Print, Inc. v. Edgar, 288 Ga.App. 326, 654 S.E.2d 413, 416 (2007) (emphasis added). See also O.C.G.A. § 13-7-1. In contrast, "a recoupment is a right of the defendant to have a deduction from the amount of the plaintiff's damages because the plaintiff has not complied with the cross-obligations or independent covenants arising under the contract being sued upon. " Id. (emphasis added). See also O.C.G.A. § 13-7-2. Therefore, the Agreement provision prohibiting set-offs does not necessarily apply to recoupment.
In its reply brief, Plaintiff argues that even if recoupment is separate from set-offs, the Court should still hold that the Agreement prohibits recoupment because (1) the clear intent of the Agreement was to require payment in full; (2) the Agreement did not provide for a right to recoupment; and (3) courts often merge the concepts of setoff and recoupment. Plaintiff also argues in its reply brief that Defendant cannot recoup because recoupment is considered to be a "counterclaim" which, like set-offs, the Agreement waives. Dkt. No. [83] at 19. However, because Plaintiff only raised these arguments in its reply brief, the Court will not consider them at this time. See In re Egidi, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not *1382 properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). Accordingly, Plaintiff's Motion for Summary Judgment is DENIED as to whether the Agreement allows Defendant to recoup payments to Plaintiff.
IV. CONCLUSION
For the above stated reasons, Plaintiff's Motion for Summary Judgment [59] is GRANTED in part and DENIED in part . It is GRANTED as to whether (1) the Performance Improvement Guarantee applies to partially-installed Systems; and (2) Defendant can delay payments. It is DENIED as to whether (1) the Agreement is valid; (2) Defendant is bound by the 117 Purchase Orders; and (3) Defendant can set-off payments owed.
IT IS SO ORDERED this 2nd day of February, 2018.

The facts in this Order are construed in a light most favorable to Defendant as the non-moving party. In addition, the Court has considered all of the parties' evidentiary objections. Those that did not change the outcome of this Order were not separately analyzed.

For example, the Performance Improvement Guarantee not only allows Defendant to discontinue the purchase of Systems if 2.5% fuel savings are not met, it also sets the price for each System by reducing the price to the extent 2.5% fuel savings are not met ("Price Reduction"). Dkt. No. [60-1] at 6.

Section 12.9 of the Agreement states: "This Agreement contains the entire agreement between the parties and supersedes all previous proposals, understandings, commitments or representations whatsoever, whether oral or written, related to the subject matter hereof...." Dkt. No. [60-1] at 14.

Plaintiff also argues it is entitled to summary judgment as to receiving the contract price for the undelivered Systems. Plaintiff only mentions the issue in passing in its original brief. Because the issue is not fully briefed, the Court will not consider it at this time.

While some courts used to prohibit motions for summary judgment on single issues of elements that did not dispose of a claim, the 2010 Amendment to Rule 56 of the Federal Rules of Civil Procedure expressly recognizes partial summary judgment. Dewit v. UPS Ground Freight, Inc., No. 1:16-cv-36-MW/CAS, 2017 WL 4875721, at *2 (N.D. Fla. Aug. 2, 2017) ; Isovolta Inc. v. ProTrans Int'l, Inc., 780 F.Supp.2d 776, 779 (S.D. Ind. 2011).

Plaintiff also argues that Defendant's interpretation would be commercially unreasonable under O.C.G.A. § 11-1-302. However, because this statute applies to variations of standards by agreement, its applicability to this case is unclear.

There appears to be a fact question on whether the parties intended to be bound by the Final Schedule considering that Plaintiff's Vice President stated in an email that the actual, not proposed, installation date triggers Defendant's payment obligations. Dkt. No. [72-46] at 3.