## A07A0465. ATLANTA INTEGRITY MORTGAGE, INC. v. BEN HILL UNITED METHODIST CHURCH, INC.
### (650 SE2d 359)

BERNES, Judge.

In this contractual dispute, Atlanta Integrity Mortgage, Inc. ("AIM") appeals from the trial court's grant of summary judgment to Ben Hill United Methodist Church, Inc. on AIM's claim for breach of contract and, alternatively, quantum meruit. For the following reasons, we reverse.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Roberts v. Coldwell Banker Kinard Realty*, 286 Ga. App. 7 (648 SE2d 442) (2007). On appeal from a summary judgment order, we conduct a de novo review and "view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." *Kaesemeyer v. Antiogenix, Inc.*, 278 Ga. App. 434 (629 SE2d 22) (2006).

So viewed, the evidence showed that in January 2004, AIM, a mortgage brokerage firm, entered into a contractual agreement with Ben Hill to secure a mortgage loan for the refinance of Ben Hill's church building project. The contract, entitled a "Customer Fee Agreement," contained the following provision related to brokerage fees:

> It is understood and agreed that as partial compensation for the services of AIM, [Ben Hill] will pay 1.000% of the mortgage loan amount to AIM. The Lender may also compensate AIM. If you cancel or transfer your loan request *prior* to loan approval, a fee of .01% of the requested amount will be payable to AIM. If you cancel or transfer your loan request *after* loan approval, the full compensation, listed in the first sentence of this paragraph, will be payable to AIM.

AIM successfully secured a loan commitment for Ben Hill from a lender named California Plan of Church Financing ("CPCF"). CPCF sent Ben Hill, via AIM, a "Commitment Letter," in which it agreed to provide bond financing for the sanctuary. The letter opened by stating that CPCF had "approved [Ben Hill's] request for bond financing," and continued to note that its issuance was subject to statutory requirements governing CPCF, reliance by CPCF on the information that had been provided to it by Ben Hill, approval by the loan committee of CPCF, and Ben Hill's compliance with the terms and conditions set forth in the letter itself.

The Commitment Letter included a provision related to mortgage broker fees, which provided that Ben Hill would pay fees "in an

amount not to exceed two percent (2.0%) of the face amount of the bond issue" from the bond proceeds, or if the proceeds were insufficient, Ben Hill would be "solely obligated to compensate [AIM] for services rendered."[1] It also contained a merger clause.

Members of Ben Hill's board, who were authorized to contract for Ben Hill, executed the Commitment Letter and returned it to CPCF with a $15,000 retainer. AIM was not a signatory to the Commitment Letter.

AIM issued Ben Hill a "Mortgage Loan Commitment," to which it attached the Commitment Letter as an exhibit. The Mortgage Loan Commitment notified Ben Hill that its application for a mortgage loan "ha[d] been approved" subject to certain contingencies, listed the terms of the loan ($19.5 million at an interest rate of 7.95 percent for 300 months), and provided that AIM was to be paid a mortgage broker fee of .75 percent.[2] The Mortgage Loan Commitment was signed by both AIM and Ben Hill.

During the months of July and August 2004, Ben Hill and CPCF exchanged various correspondence and documentation and had apparently scheduled a tentative closing date for the loan. At some point during this process, Ben Hill was notified that a lender holding a preexisting loan had agreed to extend it additional financing. As a result, Ben Hill terminated its commitment with CPCF. Ben Hill and CPCF entered into a settlement agreement and mutual release in which Ben Hill paid CPCF a fiscal advisory fee pursuant to the terms of the Commitment Letter.

But Ben Hill refused to pay AIM a broker's fee pursuant to the terms of the Customer Fee Agreement, arguing that the fee had not been realized because the CPCF loan never closed. AIM then filed the instant lawsuit, arguing that it was entitled to 1 percent of the mortgage loan amount because Ben Hill cancelled the loan request

---

[1] The pertinent portions of the provision read as follows:
Mortgage Broker Fees – [Ben Hill] shall pay Mortgage Broker Fees in an amount not to exceed two percent (2.0%) of the face amount of the bond issue, which will be paid from bond proceeds by [Ben Hill] upon sufficient proceeds available in the escrow account from bond sales. . . .

If all bonds are not sold or funds from the sale of the bonds are not sufficient, and proceeds are not available, [Ben Hill] will be solely obligated to compensate the broker for services rendered.

[Ben Hill] will provide a fully executed copy of the Mortgage (Origination) Agreement(s) by and between [Ben Hill] and the Mortgage Broker(s), and amendments thereof, an invoice from the broker(s) requesting payment, and a letter from the church authorizing CPCF, Inc. to pay such fees from bond proceeds.

[2] The record is not clear as to why AIM's commission as set forth in the Mortgage Loan Commitment varied from that contained in the Customer Fee Agreement.

with CPCF after the loan had been approved. Alternatively, AIM argued that it was entitled to payment in quantum meruit in an amount equal to 1 percent of the loan amount for services rendered.

The trial court granted Ben Hill summary judgment on the contract claim, holding that the Customer Fee Agreement had merged into the Commitment Letter, thus extinguishing the terms of the former agreement. The court held that as a result of the merger, Ben Hill's remaining obligation was to "compensate [AIM] for services rendered" under the terms of the Commitment Letter. The trial court nonetheless concluded that the Commitment Letter was unenforceable due to the contingencies set forth therein, but let survive AIM's claim for recovery of "services rendered."[3]

Contrary to the trial court's holding, the Customer Fee Agreement and the Commitment Letter did not merge under Georgia law. Under the merger rule, "[a]n existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement completely covering the subject-matter embraced by the original contract." (Citation and punctuation omitted.) *Hennessy v. Woodruff*, 210 Ga. 742, 744 (1) (82 SE2d 859) (1954). See *Wallace v. Bock*, 279 Ga. 744, 745 (1) (620 SE2d 820) (2005). "The rational basis for the merger rule is that where parties enter into a final contract[,] all prior negotiations, understandings, and agreements on the same subject matter are merged into the final contract, and are accordingly extinguished." (Citations and punctuation omitted.) *Wallace*, 279 Ga. at 745 (1). In order for the merger rule to apply, however, the parties of the merging contracts must be the same and the terms of those contracts must completely cover the same subject matter and be inconsistent. Id. at 745-746 (1) (holding that a purchase agreement and subsequent escrow agreement dealing with real property did not merge because the purchase agreement included an obligation to complete construction and convey title, while the escrow agreement dealt only with the construction); *Noorani C-Stores v. Trico V Petroleum*, 281 Ga. App. 635, 640 (3) (637 SE2d 208) (2006) (holding that one corporation cannot rely on a merger clause in a contract entered into by another corporation).

In the instant case, AIM was not a party to the Commitment Letter containing the merger clause, but was merely a signatory to

---

[3] The trial court's written order does not seem to comport with the trial court's oral findings. At the summary judgment hearing, the trial court denied Ben Hill summary judgment on the issue of quantum meruit. Nonetheless, the written order purports to grant Ben Hill summary judgment on AIM's quantum meruit claim, but leaves pending AIM's "claim for fees based upon . . . the Letter of Commitment . . . which states that 'the Issuer will be solely obligated to compensate the broker for services rendered.'" In light of the trial court's ruling that the Commitment Letter was unenforceable, such a recovery would ostensibly be based in quantum meruit.

the Mortgage Loan Commitment, to which the Commitment Letter was attached. Significantly, the merger clause contained within the Commitment Letter by its express terms was limited to Ben Hill and CPCF:

> Prior Agreements. This Commitment Letter supersedes any and/all prior agreements, oral or written between California Plan of Church Finance, Inc., and the Issuer [Ben Hill], and contains the entire agreement between the parties with respect to the subject matter hereof. No subsequent agreement, representation or promise made by any party hereto shall be of any effect unless it is in writing and executed by the party to be bound thereby.

Moreover, the Customer Fee Agreement and the Commitment Letter did not purport to cover the same subject matter. Rather, the Customer Fee Agreement governed the relationship between AIM and Ben Hill. It set forth the services that AIM would provide to Ben Hill as its mortgage broker; computed the commission that AIM would receive in the event that AIM procured a mortgage for Ben Hill and/or the penalty that Ben Hill would pay in the event that it cancelled a loan request; limited AIM's authority to bind Ben Hill to a lender; and authorized lenders to provide AIM with application information.

The Commitment Letter, on the other hand, governed the relationship between Ben Hill and CPCF. It outlined the scope of CPCF's commitment with respect to the bond financing, including the bond issue amount, the issue rate, and the bond term. In addition, it contained individually numbered paragraphs that covered, among other things, repayment, security, prepayment, fiscal advisory and retainer fees, reserve accounts, and severability. It set forth a separate list of "requirements for closing," which obligated Ben Hill to provide CPCF with financial statements, an appraisal, and a property description, and it addressed issues such as interim financing, escrow accounts, insurance, and the circumstances under which CPCF could terminate its agreement with Ben Hill. As such, the subject matter of the Commitment Letter was clearly distinct from that of the Customer Fee Agreement.[4]

---

[4] We further note that the provision contained within the Commitment Letter related to mortgage broker fees does not necessarily conflict with the terms of the Customer Fee Agreement. The Commitment Letter can be construed merely to impose a maximum amount and method by which broker fees were to be paid from the bond proceeds, in an amount otherwise governed by the Customer Fee Agreement.

Because the contracts at issue did not involve the same parties or subject matter, and because the merger clause by its express terms did not supersede any prior agreements or contracts between AIM and Ben Hill, the trial court erred in holding that the Customer Fee Agreement merged into the Commitment Letter. *Hennessy*, 210 Ga. at 744 (1); *Wallace*, 279 Ga. at 745 (1).

The Customer Fee Agreement thus controls AIM's entitlement to a fee based upon Ben Hill's cancellation of the loan request. Several genuine issues of material fact remain, however, as to the amount of compensation to which AIM may be entitled. As an initial matter, it must be determined whether Ben Hill cancelled its loan request prior to or subsequent to loan approval by CPCF pursuant to the terms of the Customer Fee Agreement. It also appears as though the Mortgage Loan Commitment, to which AIM is a party, may have modified the amount of AIM's potential mortgage commission.[5] A question of fact remains as to what effect, if any, that modification has on the provision of the Customer Fee Agreement entitling AIM to "full compensation" in the event that Ben Hill is deemed to have cancelled its loan request after loan approval.[6] Because these questions cannot be resolved on the record before this Court, the trial court erred when it granted Ben Hill summary judgment.[7]

*Judgment reversed. Johnson, P. J., and Mikell, J., concur.*

DECIDED JULY 11, 2007 —
RECONSIDERATION DENIED JULY 26, 2007.

*Lawson & Thornton, George O. Lawson, Jr.*, for appellant.
*Johnson & Freeman, Ronald J. Freeman, Maureen M. McLeod*, for appellee.

---

[5] A contract modification is defined as "[a] change or alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter of a contract intact." *Evans v. Henson*, 73 Ga. App. 494 (2) (37 SE2d 164) (1946). See *Turem v. Sinowski & Jones*, 195 Ga. App. 829 (1) (395 SE2d 60) (1990).

[6] The record contains no evidence that the parties intended that the Mortgage Loan Commitment be a novation of the Customer Fee Agreement, which would have extinguished the terms of the original contract. See *Wiederhold v. Wheeler*, 266 Ga. App. 178, 179 (596 SE2d 703) (2004).

[7] To the extent that AIM recovers under the express terms of the contracts at issue, any recovery based in quantum meruit will be prohibited. *Donchi, Inc. v. Robdol, LLC*, 283 Ga. App. 161, 167 (4) (640 SE2d 719) (2007).