**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 16, 2022**

# In the Court of Appeals of Georgia

A22A0387. GS CLEANTECH CORPORATION et al. v. CANTOR COLBURN, LLP.

DOYLE, Presiding Judge.

After GS CleanTech Corporation and GreenShift Corporation (collectively, "the Client") threatened to seek arbitration in Georgia of legal malpractice claims against their former lawyers, Cantor Colburn ("the Firm"), the Firm filed in the Superior Court of Fulton County a petition for declaratory judgment and accompanying motion to stay arbitration under OCGA §§ 9-9-5 and 9-9-6 on statute of limitation grounds. The Client moved to dismiss the Firm's petition. Following a hearing, the trial court entered a final order denying the Client's motion to dismiss, declining to rule on a statute of limitation issue, and referring the case to arbitration in Georgia. The Client appeals, arguing that (1) the trial court erred by holding that

the parties' engagement letter requiring arbitration in Atlanta controls because a subsequent fee agreement, which "supersedes all prior agreements," includes an arbitration provision requiring arbitration in Connecticut; (2) the trial court lacked subject matter jurisdiction; and (3) the trial court erred by referring the parties to arbitration in Atlanta because neither party sought a Georgia arbitration, and the claims were pending before an arbitration forum in Connecticut. For the reasons that follow, we reverse.

The record shows that in 2008, the Client engaged the Firm for representation in certain intellectual property matters. The parties memorialized their agreement in a 2008 Engagement Letter, which required them to submit any dispute arising out of the agreement to binding arbitration in Atlanta before a retired Georgia superior court judge. In August 2011, the parties executed a Fee Agreement, which amended the payment provisions of the Engagement Letter and required that all disputes between the parties relating to the Engagement Letter be resolved by binding arbitration in Hartford, Connecticut.

In 2009, the Firm commenced patent infringement litigation against various defendants on behalf of the Client. In 2014, the United States District Court for the

Southern District of Indiana issued an order invalidating the patents.[1] In September 15, 2016, the district court held that the patents were unenforceable based on the Client's deceptive practices, finding that the Client actively withheld pertinent information from the Firm during prosecution of the patents and that the Firm ignored "red flags" about the veracity of the story provided by the Client's inventors.[2]

On July 26, 2017, the Client sent a letter to the Firm's attorneys indicating for the first time that it intended to bring legal malpractice claims against the Firm arising out of its representation of the Client in the patent prosecutions. The Client did not mention arbitration in the letter, but instead requested that the Firm consent to tolling the statute of limitation on the claims.[3] On July 2, 2020, the Client sent an email to the Firm confirming a telephone conversation and stating that the Client "wanted to proceed with the arbitration of the legal malpractice claims of [the Client] against the Firm," reiterating that the parties' Engagement Letter included a provision requiring

---

[1] See *In re: Method of Processing Ethanol Byproducts & Related Subsystems ('858) Patent Litigation*, 303 FSupp3d 791 (S.D. Ind. 2014).

[2] See *In re Method of Processing Ethanol Byproducts & Related Subsystems (858) Patent Litigation.*, No. 1:10-ml-02181-LJM-DML at *157 (II) (2016 U.S. Dist. LEXIS 147886; 2016 WL 4919980) (S.D. Ind. Sept. 15, 2016).

[3] The Firm did not agree to toll the statute of limitation.

mandatory arbitration in Atlanta. On December 24, 2020, the Client sent another email to the Firm stating that it wanted to set a tentative schedule for the arbitration in Atlanta for March or April 2021 and requesting a response regarding the Firm's availability, again invoking the Engagement Letter.

On January 26, 2021, the Firm filed the instant petition under OCGA §§ 9-9-5 and 9-9-6 and an accompanying motion to stay arbitration, seeking an order staying the Client's threatened arbitration on statute of limitation grounds. The Client filed a verified answer in which it admitted that venue was proper (specifically admitting that "personal jurisdiction and venue are proper as set forth in Paragraph 11 of the Petition, but expressly deny[ing] any implication that Georgia law applies to their claims against Petitioner, or to the procedure for arbitrating those claims"), admitted that the parties executed the Engagement Letter to govern their relationship, and admitted that it sought to arbitrate claims against the Firm.

On February 24, 2021, the Client served a demand letter seeking arbitration of its malpractice claims with JAMS in Atlanta, noting that it brought its claims under the Engagement Letter. At a July 19, 2021 status hearing, however, the Client argued that the arbitration provision in the Engagement Letter was superceded by the 2011 Fee Agreement, claiming therefore that any arbitration of its claims must be

conducted in Connecticut. On April 30, 2021, the Client moved to withdraw its admission that venue was proper in Georgia,[4] moved to dismiss the petition for lack of subject matter jurisdiction, and noted that it had withdrawn its Georgia arbitration petition and instituted an arbitration in Connecticut to adjudicate its legal malpractice claims against the Firm.

On May 7, 2021, pursuant to order of the trial court, the parties submitted a stipulated list of legal issues, which included: whether the court had subject matter jurisdiction; whether venue was proper; whether the court had authority to grant the relief sought in the petition; which agreement applied – the Engagement Letter or the Fee Agreement; whether the Client's claims were time-barred; and whether the court should exercise its discretion to find that the claims were time-barred.[5]

On August 31, 2021, the trial court issued its "Final Order Denying the Respondents' Motion to Dismiss Verified Petition for Lack of Subject Matter

[4] The Client explained in the motion that it previously admitted that venue was proper in Atlanta under OCGA § 9-9-4 (b) (1) because it believed the 2008 Engagement Letter controlled the location of the arbitration. According to the Client, it later determined that the 2008 Engagement Letter had been superceded by the 2011 Fee Agreement, which requires arbitration in Hartford, Connecticut.

[5] Issues regarding the Firm's statute of limitation defense included: whether Georgia or Connecticut law controls; whether the limitation period was tolled; and whether the Client timely demanded arbitration.

Jurisdiction," finding that the Client had waived venue and that the Engagement Letter governed the parties' dispute. The court also declined to exercise its discretion to rule on the issue of the timeliness of the Client's malpractice claims, instead deferring the issue to the arbitrator and referring the case to arbitration in Atlanta. This appeal followed.

1. *Appellate jurisdiction*. In its brief, the Firm argues that this appeal should be dismissed because the trial court's order was interlocutory, and the Client filed a direct appeal instead of filing an application under OCGA § 5-6-34 (b). We disagree.

First, we note that the Firm did not file a separate motion to dismiss as required by Court of Appeals Rule 41 (b).[6] Nevertheless,

> it is the duty of this Court to inquire into its jurisdiction in any case in which there may be a doubt about the existence of such jurisdiction. We must consider, then, whether we have jurisdiction to consider [this case as a] direct appeal[] or whether [an] application[] for discretionary appeal [was] necessary. And in doing so, we conclude [this] case[] [was] properly brought as [a] direct appeal[].[7]

---

[6] Court of Appeals Rule 41 (b) states in relevant part that "[a]ll motions . . . shall be filed as separate documents," and "[n]o motions . . . shall be filed in the body of briefs. . . ."

[7] (Citations and punctuation omitted.) *Sons of Confederate Veterans v. Newton County Bd. of Commrs.*, 360 Ga. App. 798, 800-801 (1) (c) (861 SE2d 653) (2021),

6

The Firm argues that an order denying a motion to dismiss is interlocutory, as is an order compelling parties to arbitration. Pretermitting the validity of this contention as applied to this case, OCGA § 5-6-34 (a) (1) authorizes direct appeals from "[a]ll final judgments, that is to say, where the case is no longer pending in the court below. . . ."

In this case, the order appealed is styled "Final Order Denying Respondents' Motion to Dismiss Verified Petition for Lack of Subject Matter Jurisdiction." But "'[u]nder our rules of pleading, it is substance and not mere nomenclature that controls.'"[8] "An order is considered a final judgment within the meaning of OCGA § 5-6-34 (a) (1) where it leaves no issues remaining to be resolved, constitutes the court's final ruling on the merits of the action, and leaves the parties with no further recourse in the trial court."[9]

---

cert. granted *Sons of Confederate Veterans v. Newton County Bd. of Commrs.*, Case No. S22G0045 (Mar. 8, 2022).

[8] *Cobb Center Pawn & Jewelry Brokers v. Gordon*, 242 Ga. App. 73, 74 (1) (529 SE2d 138) (2000).

[9] (Punctuation omitted.) *CitiFinancial Svcs., Inc. v. Holland*, 310 Ga. App. 480, 481 (713 SE2d 678) (2011), quoting *Standridge v. Spillers*, 263 Ga. App. 401, 403 (1) (587 SE2d 862) (2003).

Here, "us[ing] the [m]otion to [d]ismiss as the vehicle by which to resolve all of the outstanding issues in [the] case," the trial court denied the Client's motion to dismiss, declined to rule on the timeliness of the Client's claims and stay arbitration under OCGA § 9-9-5, and referred the matter for arbitration in Georgia. The trial court decided all of the matters raised in the petition and the parties' stipulated list of issues, leaving no other issues to be resolved in the trial court, and therefore, the order was final as to the proceeding in the superior court. Accordingly, this case was properly brought as a direct appeal, and the Firm's request for dismissal is denied.[10]

2. *Which agreement controls*. The Client argues that the trial court erred by finding that the parties' Engagement Letter arbitration provision controls the resolution of its legal malpractice claims because the entire Engagement Letter was superseded by the Fee Agreement. We agree.

---

[10] See *Extremity Healthcare, Inc. v. Access to Care America, LLC*, 339 Ga. App. 246, 251 n. 3 (793 SE2d 529) (2016) (holding that the appeal of an order compelling arbitration and staying proceedings was directly appealable because the order was final and dismissed the entire case), citing *Torres v. Piedmont Builders*, 300 Ga. App. 872 (1) (686 SE2d 464) (2009) (holding that the appeal of an order compelling arbitration was from a final judgment directly appealable under OCGA § 5-6-34 (a) (1) because the trial court's arbitration order "dismiss[ed] the original action in its entirety, and the case [was] no longer pending in the superior court").

"Arbitration in Georgia is a matter of contract. As such, the construction of an arbitration clause in a contract is subject to the ordinary rules of contract construction."[11] We review the trial court's construction of the parties' agreements de novo.[12] Contract construction involves three steps:

First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.[13]

The cardinal rule of contract construction is to ascertain the intention of the parties. When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent. In the face of ambiguity, we must look to the entirety of the agreement to determine the intent of the parties. Indeed, it is axiomatic that contracts must be construed in their entirety

---

[11] (Citations and punctuation omitted.) *SCSJ Enterprises v. Hansen & Hansen Enterprises, Inc*., 319 Ga. App. 210, 212 (1) (734 SE2d 214) (2012).

[12] See *Borders v. City of Atlanta*, 298 Ga. 188, 197 (II) (779 SE2d 279) (2015).

[13] (Citation omitted.) *City of Baldwin v. Woodard & Curran, Inc*., 293 Ga. 19, 30 (3) (743 SE2d 381) (2013).

and in a manner that permits all of the terms contained therein to be consistent with one another. Further, where there is ambiguity, the agreement will be construed against the drafter and in favor of the non-drafter.[14]

The Client's argument is based upon the merger rule. "[T]he rational basis for merger clauses is that where parties enter into a final contract[,] all prior negotiations, understandings, and agreements on the same subject are merged into the final contract, and are accordingly extinguished."[15] "In order for the merger rule to apply, however, the parties of the merging contracts must be the same and the terms of those contracts must completely cover the same subject matter and be inconsistent."[16]

In this case, the parties' 2008 Engagement Letter "sets forth the terms of the [the parties'] engagement" and states that the Client was engaging the firm "in connection with . . . intellectual property matters." The Engagement Letter sets forth the terms and conditions upon which the Firm provided legal representation to the

---

[14] (Citation and punctuation omitted.) *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 324 (834 SE2d 800) (2019).

[15] *First Data POS, Inc. v. Willis*, 273 Ga. 792, 795 (2) (546 SE2d 781) (2001), quoting *Health Svc. Centers v. Boddy*, 257 Ga. 378, 380 (2) (359 SE2d 659) (1987).

[16]*Atlanta Integrity Mtg., Inc. v. Ben Hill United Methodist Church, Inc.*, 286 Ga. App. 795, 797 (650 SE2d 359) (2007), citing *Wallace v. Bock*, 279 Ga. 744, 745-746 (1) (620 SE2d 820) (2005).

Client, including fees, payment of costs, timing of billing statements, termination of the Firm's services, a statement that the Firm carried errors and omissions insurance, a conflict provision, and a section disclaiming any guarantee of success. The Letter also includes the following arbitration provision:

> *ARBITRATION AND WAIVER OF JURY TRIAL.* ANY DISPUTE BASED UPON OR ARISING OUT OF OUR ENGAGEMENT, THIS LETTER AGREEMENT AND/OR THE PERFORMANCE OR FAILURE TO PERFORM SERVICES (INCLUDING, WITHOUT LIMIT, CLAIMS OF PROFESSIONAL NEGLIGENCE) SHALL BE SUBJECT TO BINDING ARBITRATION TO BE HELD IN ATLANTA, GEORGIA[,] BEFORE A RETIRED GEORGIA SUPERIOR COURT JUDGE. JUDG[]MENT ON THE ARBITRATOR'S AWARD SHALL BE FINAL AND BINDING, AND MAY BE ENTERED IN ANY COMPETENT COURT. AS A PRACTICAL MATTER, BY AGREEING TO ARBITRATE[,] ALL PARTIES ARE WAIVING JURY TRIAL.

In August 2011, the parties executed the Fee Agreement, which contains two WHEREAS recitals; the first indicates that the Client "has retained [the Firm] to perform [s]ervices," and the second memorializes the parties' intent to "agree upon a process through which [the Firm] will be compensated for the provision of

11

[s]ervices. . . ."[17] In the Fee Agreement, the Client acknowledges that it owed the Firm $1,003,264 for services previously rendered. The Fee Agreement contains detailed provisions for payment of future and past due amounts through monthly payments and, at the Firm's discretion, by converting the debt into stock in the Client's parent company. The Fee Agreement also contains an arbitration provision providing that

> [a]ll disputes between the parties relating to this Agreement shall be finally settled by binding arbitration in accordance with the then prevailing procedure of the American Arbitration Association ("AAA"). . . . The arbitration shall be held in Hartford, Connecticut. . . . The arbitrator shall not have the authority to render any award or make any ruling inconsistent with or beyond the scope of the terms of this Agreement or inconsistent with the law of the state of Connecticut. . . .

Most importantly, however, the Fee Agreement also contains a merger, or "final agreement," clause: "*Final Agreement*. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and

---

[17] The Fee Agreement indicates that the term "Agreement" refers to "This FEE AGREEMENT." It also defined, among other items, "[s]ervices" provided by the Firm to the Client, including "patent prosecution activities," and "[c]urrent [m]atters" and [f]uture [m]atters," including the patents and the "multi-district litigation" out of which the legal malpractice claims in this case arose.

12

supersedes all prior agreements, understandings, commitments, negotiations, and discussions, whether oral or written."

The Firm argues that the Fee Agreement serves the limited purpose of amending the compensation process between the parties for both past due and future payments by the Client, and that unlike the Engagement Letter, the Fee Agreement does not address the Firm's billing rates, errors and omissions insurance, conflicts, or guaranties of success by the Firm. Thus, the Firm contends, the Fee Agreement does not modify the parties' entire agreement, but instead memorializes the parties' new agreement about the subject matter of the Fee Agreement, which is compensation by the Client to the Firm. The Firm further emphasizes that the Engagement Letter's arbitration provision requires mandatory arbitration of any dispute based on or arising out of the parties' engagement, specifically including claims of professional negligence; in contrast, the Fee Agreement dispute resolution provision is limited to "all disputes between the parties relating to this Agreement."

Nonetheless, the Fee Agreement contains an unambiguous statement that it "*supersedes all prior agreements*, understandings, commitments, negotiations, and discussions, whether oral or written."[18] The Supreme Court of Georgia has applied

---

[18] (Emphasis supplied.)

13

the merger rule in a case with an almost identical merger clause.[19] Furthermore, "[t]he differing . . . obligations contained in the two agreements do not create any ambiguity in the application of the merger clause."[20] Accordingly, the Fee Agreement supersedes the Engagement Letter in its entirety as to the matters therein.[21]

The Firm also argues that even if the Engagement Letter was superseded by the Fee Agreement, the original arbitration agreement nonetheless survives the

---

[19] See *First Data POS, Inc.*, 273 Ga. at 794-795 (2) (holding that based on an almost identical "unambiguous," "standard" merger clause in the parties' second agreement, the second agreement superceded their first agreement).

[20] *Belt Power, LLC v. Reed*, 354 Ga. App. 289, 292 (1) (840 SE2d 765) (2020) (holding that the parties' first agreement was superseded and replaced by the parties' subsequent agreement, which contained an unambiguous merger clause).

[21] See *First Data POS*, 273 Ga. at 794-795 (2); *Legacy Academy, Inc. v. Mamilove, LLC*, 297 Ga. 15, 19-20 (2) (771 SE2d 868) (2015) (holding that agreement with a "comprehensive" merger clause almost identical to the instant case supercedes parties' prior agreement); *Belt Power, LLC*, 354 Ga. App at 292 (1). We note that the Firm has not cited any case rejecting the application of the merger doctrine in which the parties' subsequent agreement contains an unambiguous merger clause between the same parties. Compare *Wallace*, 279 Ga. at 745-746 (1) (holding that a purchase agreement and subsequent escrow agreement did not merge because the purchase agreement included an obligation that the escrow agreement did not; the escrow agreement did not, however, contain a merger clause); *Atlanta Integrity Mtg.*, 286 Ga. App. at 799 ("Because the contracts at issue did not involve the same parties or subject matter, and because the merger clause by its express terms did not supersede any prior agreements or contracts between [the parties], the trial court erred [by] holding that the [contracts] merged. . . .").

14

extinguishment of the Engagement Letter under the doctrine of severability.[22] None of the cases cited by the Firm apply the doctrine of severability to a superseding contract that contains both an entire agreement/merger clause and a new arbitration clause. And we decline to do so here.

Accordingly, the trial court erred by finding that the arbitration clause in the Engagement letter mandating arbitration in Atlanta governs the resolution of the Client's legal malpractice claims against the Firm.

3. *Subject matter jurisdiction*. The Client argues that the trial court erred by finding "that it had subject matter jurisdiction to determine the timeliness of its claims, which are contractually required to be arbitrated in Connecticut."

---

[22] In support of this argument, the Firm relies on *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U. S. 440, 445-446 (II) (B) (126 SC 1204, 163 LE2d 1038) (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract[, and] . . . this arbitration law applies in state as well as federal courts."); *Jhun v. Imagine Castle, LLC*, 358 Ga. App. 627, 630-631 (1) (856 SE2d 24) (2021) (applying doctrine of severability and affirming order compelling arbitration based on arbitration provision in the parties' contract notwithstanding challenge to the enforceability of the contract); *Perry Golf Course Dev., LLC v. Columbia Residential LLC*, 337 Ga. App. 525, 529 (1) (786 SE2d 565) (2016) (enforcing arbitration clause based on "unambiguous severability clause" even though the parties' agreement regarding certain obligations was unenforceable due to lack of mutuality).

15

The phrase jurisdiction of the subject matter refers to subject matter alone, i.e., conferring jurisdiction in specified kinds of cases. It is the power to deal with the general abstract question, to hear the particular facts in any case relating to this question. Jurisdiction of the subject matter does not mean simply jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the class of cases to which that particular case belongs. It is the sine qua non to a valid judgment, and may not be waived by consent of the parties.[23]

Under OCGA § 9-9-3:

A written agreement to submit any existing controversy to arbitration or *a provision in a written contract to submit any controversy thereafter arising to arbitration* is enforceable without regard to the justiciable character of the controversy and *confers jurisdiction on the courts of the state* to enforce it and to enter judgment on an award.[24]

The Firm filed its petition seeking relief under the Engagement Letter (requiring arbitration in Georgia) and arguing that, as we concluded in Division 2, the Engagement Letter was superseded by the Fee Agreement (requiring arbitration in Connecticut). Therefore, the Client argues, the trial court did not have subject matter

_____

[23] (Citations and punctuation omitted.) *Crutchfield v. Lawson*, 294 Ga. 407, 409 (754 SE2d 50) (2014), quoting *Hopkins v. Hopkins*, 237 Ga. 845, 846 (1) (229 SE2d 751) (1976).

[24] (Emphasis supplied.)

16

jurisdiction, as conferred by the Georgia Arbitration Code ("GAC"), when the petition was filed. This argument is without merit.

"[S]ubject matter jurisdiction is assessed at the time of the filing of a suit and is not lost by the occurrence of subsequent developments."[25] The Firm filed its petition under OCGA § 9-9-5 (a), which confers jurisdiction on the superior court when a party brings "a claim sought to be arbitrated" that it argues "would be barred by the limitation of time had the claim sought to be arbitrated been asserted in court."[26] At the time the Firm filed the petition, the Client was seeking to arbitrate claims against the Firm. Accordingly, the trial court had subject matter jurisdiction as to that question.

4. Finally, the Client contends that the trial court "decided a moot issue" by referring the parties to arbitration in Atlanta because neither party sought a Georgia arbitration at that point, and the claims were pending before an arbitration forum in Connecticut. The complaint belies this argument, and in any event, our holding in

---

[25] *Bobick v. Community & Southern Bank*, 321 Ga. App. 855, 866 (3) (d) (743 SE2d 518) (2013).

[26] OCGA § 9-9-5.

Division 1 controls this issue. Arbitration is proper in Hartford, Connecticut, and therefore, the trial court erred by referring the parties to arbitrate in Atlanta.

*Judgment reversed. Reese, J., and Senior Appellate Judge Herbert E. Phipps concur*.